**LANCASHIRE COAL COMPANY,**
Petitioner,

v.

**SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION (MSHA), Respondent.**

Nos. 91–3433, 91–3566.

United States Court of Appeals,
Third Circuit.

Argued Feb. 25, 1992.

Decided June 29, 1992.

James R. Haggerty, Steven P. Fulton (argued), Reed Smith Shaw & McClay, Pittsburgh, Pa., for petitioner.

David S. Fortney, Deputy Sol., Allen H. Feldman, Associate Sol., Kerry L. Adams, Counsel for Appellate Litigation, Deborah Greenfield (argued), U.S. Dept. of Labor, Washington, D.C., for respondent.

Before: SLOVITER, Chief Judge, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Before us is a petition of Lancashire Coal Company for review of a decision by the Federal Mine Safety and Health Review Commission (Review Commission) affirming by an equally divided vote a ruling by an administrative law judge upholding two citations issued by the Mine Safety and Health Administration (MSHA) against Lancashire in connection with reclamation work done at an abandoned coal preparation plant. The issue before us is whether MSHA had statutory jurisdiction over the worksite at the time the citations were issued. Underlying this straightforward issue is the more complex question of the role of the federal courts in construing a statute in which Congress apparently inadvertently failed to include the dispositive jurisdictional language.

## I.

*Facts and Procedural History*

The parties stipulated to most of the pertinent historical facts.

On March 20, 1989, an employee of the contractor engaged to dismantle some unused structures was killed during the demolition of a coal silo at the Lancashire Coal Company Preparation Plant in Cambria County, Pennsylvania. The coal silo had not been used since 1971.

The area where the accident occurred was adjacent to a sealed coal mine known as "Lancashire Mine #25," which was owned by Lancashire's parent company, Inland Steel Company. No coal had been mined at Lancashire Mine #25 since 1983, and in 1986 all mine shafts were sealed. Although MSHA conducted periodic inspections of the worksite for several years after the mine was sealed, an MSHA Field Office declared the worksite to be "permanently abandoned" in September 1988, and MSHA consequently ceased inspecting the worksite.

Under Pennsylvania law, a mine operator is required to remove surface facilities (such as silos) as part of the process of restoring lands that had been used for mining. In late 1988, Lancashire hired K & L Equipment Co., Inc., to dismantle the structures at the worksite.

On March 20, 1989, four K & L employees were engaged in dismantling the coal silo, which measured approximately sixty-five feet in height and forty feet in diameter. No supervisor or foreman was assigned to the project. The victim, Robert Bell, was engaged in cutting steel reinforcement bands from the base of the silo when a section of the silo collapsed, burying Bell alive in approximately forty tons of debris.

The day after the accident, MSHA inspectors arrived at the worksite to investigate the accident. MSHA concluded that the accident was caused by "management's failure to provide an adequate plan for the safe demolition of the coal silo to prevent exposure of the worker to the hazards of falling material. The presence of coal in the silo, causing pressure on the weakened portion of the silo, also contributed to the accident." App. at 145. Accordingly, in March and April 1989 an MSHA inspector issued three citations and two orders to Lancashire with regard to the reclamation work. The citations were for (1) Lancashire's failure to maintain the coal silo in good repair at the time of the demolition, (2) Lancashire's failure to file records of K & L's work at the site, and (3) Lancashire's failure to give notification that it was "reopening" a mine.

Lancashire challenged these citations in a proceeding before an administrative law judge. The ALJ vacated the citation for reopening the mine because the language in the regulation requiring notification was limited to situations in which active mining operations were to be recommenced at the site, *see* 30 C.F.R. § 77.1712 (1991), and the parties stipulated that Lancashire took no actions to recommence active mining operations.

However, the ALJ upheld the first two citations, holding that the worksite was subject to the jurisdiction of MSHA. The ALJ reasoned that although MSHA had previously accorded the mine "permanently abandoned" status, this determination meant only that MSHA would no longer conduct periodic inspections of the site, not that the site was no longer a coal mine subject to MSHA's statutory jurisdiction. The ALJ observed that when silos and other structures are constructed at a coal mine, MSHA indisputably has jurisdiction. The ALJ concluded that the silo was a "structure[ ] which [was] the result of the prior active mining of coal, including extraction and processing, and fall[s] within the statutory definition of coal or other mine." App. at 200.

Lancashire appealed the ALJ's decision to the Federal Mine Safety and Health Review Commission, which upheld the decision by an equally divided vote. Lancashire has filed a timely petition for review of this final decision by the Review Commission, and we have jurisdiction pursuant to 30 U.S.C. § 816(a)(1) (1988).

## II.

### *Discussion*

The Federal Mine Safety and Health Act provides: "Each *coal or other mine*, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to [MSHA regulation]." 30 U.S.C. § 803 (1988) (emphasis added). The question whether MSHA had statutory jurisdiction over the worksite at the time the citations were issued turns on whether the abandoned Lancashire Coal Preparation Plant is a "coal or other mine" within the meaning of the Act.

Section 3(h)(1) of the Act defines "coal or other mine" as:

(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, *structures*, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, *used in, or to be used in, or resulting from, the work of extracting such minerals* from their natural deposits in nonliquid form, or if in liquid form, with workers underground, *or used in, or to be used in*, the milling of such minerals, or *the work of preparing coal* or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment.

30 U.S.C. § 802(h)(1) (emphasis added). The parties agree that the silo at issue here had been used to store coal, and coal storage is explicitly covered within the definition of "work of preparing the coal" contained in 30 U.S.C. § 802(i).

Lancashire argues that because the silo that collapsed had not been used since 1971, and the preparation plant of which it was a part ceased being used well before the accident occurred, the silo was not "used in, or to be used in" the work of preparing the coal within the meaning of section 3(h)(1) at the time MSHA asserted jurisdiction in this case, and therefore was not a "coal or other mine" subject to MSHA jurisdiction. Lancashire parses the statutory language to cover three potential time periods for the involvement of structures in mining activity: (1) the term "used in" meaning current use, i.e. *"being* used in"; (2) the term "to be used in" meaning contemplated use; and (3) the term "resulting from" meaning former use.

The statute refers to three different mining activities: "extracting" minerals; "milling" minerals; and "preparing coal or other minerals." Lancashire argues that because the language of section 3(h)(1) explicitly covers within the definition of "coal or other mine" structures "used in, or to be used in, or resulting from" the work of extracting coal (all three time periods) but only structures "used in, or to be used in" the milling of or preparing coal, the silo in this case does not fall under MSHA's statutory jurisdiction. The absence of the words "resulting from" before the words "the work of *preparing* coal" is dispositive in Lancashire's statutory construction.[1]

The Secretary of Labor concedes that the silo was a structure "resulting from" the preparing of coal and that section 3(h)(1) does not, by its express terms, cover it. The Secretary argues, however, that Congress in section 3(h)(1) "inadvertently omitted" to include the words "resulting from" before the words "work of preparing coal." Brief for Respondent at 14. The Secretary

---

1. Arguably "used in" could be construed to cover structures that "had once been used in" the preparation of coal. This statutory interpretation, however, would make redundant the words "resulting from" and has never been proffered by the Secretary or adopted by the Review Commission.

contends that there is an ambiguity in the statutory language created by the definition of the term "coal mine" in section 3(h)(2), which does expressly cover structures resulting from coal preparation. *See* 30 U.S.C. § 802(h)(2).[2] Although the Secretary acknowledges that section 3(h)(2) is not applicable to this case because its definition of coal mine only applies to subchapters II, III, and IV of the Act (which cover, *inter alia,* the Black Lung Act), the Secretary argues that "[r]ather than mindlessly assume that Congress intended to create two inconsistent definitions of 'coal mine' within the same subsection of the statute," we should look to the legislative history to determine legislative intent. Brief for Respondent at 17.

■ The words of the statute lend considerable support for Lancashire's position, and when the statutory language is clear a court need ordinarily look no further. Here, however, the language leads to an anomalous result, and we therefore will also consider the legislative history to see if it aids us in determining the meaning of section 3(h)(1). *See Train v. Colorado Pub. Interest Research Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (" 'When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' ' "); *see also United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).

■ In analyzing the legislative history, it is important to note that there was both a Senate and a House version of the bill that became the Federal Mine Safety and Health Act, and that these versions defined "mine" slightly differently. The difference relevant to this case between the

original versions of the bills reported out of the respective House and Senate Committees was that the House version covered only structures "used in" preparing coal, whereas the Senate version covered structures "used in or to be used in" preparing coal. *Compare* H.R. 4287, 95th Cong., 1st Sess. § 102(b)(2) (1977), *reprinted in* Legislative History of the Federal Mine Safety and Health Act of 1977 (hereinafter "Leg. Hist. FMSHA"), at 266, 343–44 (1978), *with* S. 717, 95th Cong., 1st Sess. § 102(b)(3) (1977), *reprinted in* Leg. Hist. FMSHA at 433, 510–11. Neither version of the applicable section of the bill as reported out of committee purported to cover structures "resulting from" the preparation of coal.

Nonetheless, the committee reports accompanying both versions of the bill, while not explicitly addressing the precise issue raised by this case, demonstrate that both the Senate and the House intended the definition of mine to be broad, and there is language in each report lending some support to the Secretary's contention. In particular, the Senate Report stated:

> the structures on the surface or underground, which are used or are to be used in *or resulting from the preparation* of the extracted minerals are included within the definition of "mine." The Committee notes that there may be a need to resolve jurisdictional conflicts, but it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act.

S.Rep. No. 181, 95th Cong., 1st Sess. 14 (1977), *reprinted in* Leg. Hist. FMSHA at 589, 602 (emphasis added).

The House Report also indicates that the definition of mine was intended to be

---

**2.** Section 3(h)(2) provides:

> For purposes of subchapters II, III, and IV of this chapter, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, *used in, or to be used*

*in, or resulting from,* the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and *the work of preparing the coal* so extracted, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(2) (emphasis added).

broad. The Report stated that the definition of "coal or other mine" in section 102(b)(2) of the House bill included "lands, passageways, facilities, etc., to be used in or resulting from the work of extracting minerals, including custom coal preparation facilities and milling operations." H.Rep. No. 312, 95th Cong., 1st Sess. 28 (1977), *reprinted in* Leg. Hist. FMSHA at 384.

Because the substantive provisions of the Act centralized federal regulation over both coal and noncoal mining, some legislators expressed concerns that the interim safety provisions in Titles II and III of the Act and the Black Lung provisions in Title IV might erroneously be interpreted as applying to noncoal mines. *See, e.g.,* Leg. Hist. FMSHA at 1019–20, 1058–59 (remarks of Sen. Hatch); *id.* at 1009 (remarks of Sen. Williams). Accordingly, as enacted into law, the statute included a definition of "coal mine" in section 3(h)(2), which is limited to Titles II, III, and IV of the statute, and a definition of "coal or other mine" in section 3(h)(1), which is the one applicable here. *See* S.Conf.Rep. No. 461, 95th Cong., 1st Sess. 38 (1977), *reprinted in* Leg. Hist. FMSHA at 1279, 1316. As already discussed, the definition of coal mine in section 3(h)(2) explicitly covers structures resulting from the preparation of coal. *See* 30 U.S.C. § 802(h)(2).

However, while we recognize that the two separate definitions in section 3(h)(1) and 3(h)(2) were designed to make clear that the provisions in Titles II, III, and IV did not apply to noncoal mines, this does not explain Congress's use of distinct bases for those definitions. The Secretary attempts to explain the distinction by contending that the words "resulting from" were inadvertently omitted from section 3(h)(1) in connection with coal preparation structures, and this position was apparently accepted by the two members of the Review Commission who voted to affirm the citations. *See* App. at 235.

We agree that inadvertent omission may be a plausible explanation for the distinction between sections 3(h)(1) and 3(h)(2). But the legislative history is simply not clear enough to demonstrate that Congress intended the words in section 3(h)(1) to be construed as covering the abandoned silo at issue in this case.[3] As the two Commissioners voting to affirm the citations acknowledged, "[t]he Committee Report does not state why the Committee did not include the language 'or resulting from' in the definition in section 3(h)(1) in reference to the work of preparing coal." *See* App. at 235. Moreover, while the House and Senate Committee Reports do show a legislative intention that the Act be construed broadly in favor of coverage, there is no indication that Congress intended to cover the demolition work at issue in this case.

Because we conclude that the legislative history does not reveal "a clearly expressed legislative intention" contrary to the meaning we have inferred from the language of the statute, we regard the statutory language as conclusive. *See Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 110–16, 100 S.Ct. 2051, 2057–60, 64 L.Ed.2d 766 (1980). Thus, assuming *arguendo* that we would owe deference to the Secretary's interpretation of the extent of MSHA's jurisdiction under the statute,[4]

---

**3.** The two dissenting Commissioners noted that while the legislative history indicates that Mine Act coverage is to be expansive, "it is not without bounds and one must also consider that the Mine Act was intended to establish a 'single mine safety and health law, applicable to all *mining* activity.'" App. at 245 (quoting S.Rep. No. 461, 95th Cong., 1st Sess. 37 (1977), *reprinted in* Leg. Hist. FMSHA at 1279, 1315 (emphasis added)). The dissenters noted that there is no indication that Congress intended the Mine Act to "govern the building demolition industry or its employees," App. at 245, and that MSHA's failure to adopt specific regulations tailored to the demolition activity in question signifies that

OSHA's residual jurisdiction over the demolition activity was not displaced. *See infra* note 6.

**4.** We thus avoid the need to reach the question as to when an agency is entitled to deference on issues regarding its own jurisdiction. *Compare Puerto Rico Maritime Shipping Auth. v. Valley Freight Sys.,* 856 F.2d 546, 552 (3d Cir.1988) (*Chevron* "rule of deference is fully applicable to an agency's interpretation of its own jurisdiction") *with Air Courier Conference of Am./Int'l Comm. v. U.S. Postal Serv.,* 959 F.2d 1213, 1226 (3d Cir.1992) (Becker, J., concurring) (*Puerto Rico Maritime Shipping Authority* "should not be read literally to suggest that agencies *always*

we cannot conclude that the Secretary's interpretation is reasonable in this case insofar as it conflicts with the language of the statute. *See Air Courier Conference of Am./Int'l Comm. v. U.S. Postal Serv.*, 959 F.2d 1213, 1224 (3d Cir.1992); *cf. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988).[5] If Congress does in fact intend to cover the activity of reclamation of structures that were once used in preparation of coal, but are no longer being so used, within the jurisdiction of MSHA rather than the Occupational Safety and Health Administration,[6] it can amend section 3(h)(1) to add the two missing words.

## III.

### Conclusion

We have concluded that MSHA did not have statutory jurisdiction under the Federal Mine Safety and Health Act over the abandoned Lancashire coal silo at the time it issued the citations in this case. We will grant the Petition for Review and set aside the decision of the Review Commission.

---

possess superior expertise in determining their jurisdiction and hence *always* deserve deference on that issue"). *See generally* Cass R. Sunstein, Law and Administration After *Chevron*, 90 Colum.L.Rev. 2071, 2098–2100 (1990) (noting division of authority, concluding that "[p]robably the best reconciliation of the competing considerations of expertise, accountability, and partiality is to say that no deference will be accorded to the agency when the issue is whether the agency's authority extends to a broad area of regulation, or to a large category of cases, except to the extent that the answer to that question calls for determinations of fact and policy").

5. Moreover, we note that the Act has not been interpreted consistently as applying to reclamation work done at abandoned mine sites. The record contains a memorandum, referred to by the parties as the "Huntsville Gob" Memorandum, written by the Associate Solicitor of the Department of Labor, that concludes that MSHA lacked jurisdiction over a reclamation project undertaken at a former mine site. In the Huntsville Gob Memorandum, the Associate Solicitor wrote that under section 3(h)(1):

MSHA has jurisdiction over certain reclamation activities, such as surface work performed by the mine operator immediately following mining to restore mined land to its original contour. However, other activities more remote from mining, such as reclamation work occurring on previously mined abandoned lands are not subject to the Mine Act. The factors considered when determining MSHA's authority in such cases include (1) the nature of the activities, particularly in relation to activities normally associated with mining; (2) the relationship in time and the geographic proximity of the activities in question to active mining operations; (3) the nature of the land at the time of the activities; and (4) the operational relationship of the activities to active mining operations, including the control and direction of the workforce and the degree to which equipment or facilities are shared with active mining operations. App. at 178–79. The memorandum concluded that the hauling of gob from an abandoned mine site was not within MSHA's jurisdiction since no coal had been mined at the site for more than a year and the activities being performed were only incidentally related to coal mining. App. at 179.

While the Huntsville Gob Memorandum is not binding on the Secretary and the facts of that case were apparently distinguishable from those here, the memorandum does show that there has not been a consistent agency policy that MSHA has jurisdiction over all reclamation activity at abandoned mine sites.

6. Under the Occupational Safety and Health Act of 1970, OSHA has broad jurisdiction over conditions at the workplace unless other federal agencies "exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). The parties in this case dispute whether MSHA has in fact exercised any statutory authority it may have to prescribe regulations or standards applicable to the demolition at issue. Because we decide that MSHA has no statutory authority over the activity at issue in this case, we need not resolve that question.