COMPETITIVE ENTERPRISES
INSTITUTE, et al.,
Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, Defendant.

Civil Action No. 96–1007(RCL).

United States District Court,
District of Columbia.

May 30, 1996.

James A. Moody, Washington, DC, for plaintiffs.

Thomas William Millet, IV, U.S. Dept. of Justice, Civ. Div., Washington, DC, Judry Laeb Subar, U.S. Dept. of Justice, Federal Programs Branch, Washington, DC, for defendant.

John Robert Fleder, Richard Laurence Frank, Olsson, Frank & Weeda, P.C., Washington, DC, for amicus Nat. Confectioners Ass'n, Chocolate Mfrs. Ass'n.

Joseph Muldoon, Washington, DC, for amicus Nat. Peanut Growers Group.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on plaintiffs' motion for a preliminary injunction. In a nutshell, this dispute concerns the impact of the 1996 Federal Agriculture Improvement and Reform Act ("FAIR Act") on the quotas set by the Secretary of Agriculture ("the Secretary") for domestically-grown peanuts. At a hearing on May 15, 1996, this court denied plaintiffs' motion for a temporary restraining order. After considering the submissions of counsel, briefs of amicus curiae from the National Peanut Growers Group as well as the Chocolate Manufacturers Association and the National Confectioners Association, and the relevant law, the court finds that plaintiffs are not entitled to the extraordinary relief sought and shall accordingly deny the motion for a preliminary injunction. The court finds that plaintiffs have failed to show either a likelihood of success on the merits of their underlying claim or any irreparable injury if the injunction is denied. Further, the court finds that the potential harm to other parties and considerations of the public interest also counsel in favor of denying plaintiffs' motion.

The court was prepared to issue a ruling on plaintiffs' motion for a preliminary injunction when plaintiffs submitted their overdue,

oversized reply brief to the government's opposition and requested the court to consolidate, under Federal Rule of Civil Procedure 65(a)(2), its determination on the merits with the preliminary injunction apparently joining defendant's May 13 motion. The court now decides the merits of the case, but addresses herein irreparable injury, harm to other parties, and the public interest so that a motion for stay pending appeal need not be filed with this court and plaintiffs may directly proceed to the Court of Appeals. Accordingly, the court shall deny plaintiffs' motion for a preliminary injunction as moot, grant the parties' motion to consolidate, and enter final judgment in favor of defendant.

# I

## BACKGROUND

A. *Statutory Background of Peanut Regulation.*

In order to reach the legal issues in this matter, it is necessary to understand the statutory and historical context of peanut regulation in this country. With the passage of the Agriculture Adjustment Act of 1938 ("AAA"), 7 U.S.C. § 1281 *et seq.*, Congress began regulating the supply of a series of agricultural commodities, including peanuts. Part of the Depression-era legislation, the AAA was enacted as a temporary measure designed to provide income support to farmers by limiting supply in order to artificially inflate market prices. With the exception of a brief suspension during World War II, Congress has continuously regulated peanut production through a quota system set by the Secretary. However, the nature and reach of the quotas set by the Secretary have not remained constant since 1938. In fact, the Congressional modifications of the quota system give rise to this dispute.

1. *Regulation Under the AAA.*

Under the AAA, the Secretary controlled peanut production and prices by both limiting the number of acres that could be planted to peanuts and by setting a "marketing quota" which limited the amount of peanuts that

could be marketed without penalty. Section 358 of the AAA (7 U.S.C. § 1358) delineates the particulars of the regulation. Significantly, the AAA made no distinction as to the uses for which the peanuts were sold. In other words, one quota was imposed whether the farmers sold the peanuts for edible food usage, export, or crushing.[1]

In 1949, Congress also added provisions for price support to peanut producers in the Agricultural Act of 1949, 7 U.S.C. § 1421 *et seq.* By 1953, Congress had imposed import quotas designed to prevent foreign producers from flooding the domestic market and undercutting the artificially inflated price set by the quota system.

In order to ensure that the marketing quota imposed would meet consumer demands, the AAA contained a provision that allowed the Secretary to adjust the marketing quotas if it appeared as though the peanuts produced would be insufficient to meet the demands of the market. Section 371 of the AAA acted as a safety valve to give the Secretary the flexibility to increase or eliminate the quotas after a notice and comment period. *See* 7 U.S.C. § 1371. In particular, the Secretary can increase or eliminate the marketing quotas "[i]f at any time the Secretary has reason to believe that in the case of ... peanuts ... the operation of farm marketing quotas in effect will cause the amount of such commodity which is free of marketing restrictions to be less than the *normal supply* for the marketing year...." *Id.* (emphasis added). The AAA defines "normal supply" as the sum of the estimated domestic consumption of peanuts for the prior marketing year, the estimated exports of peanuts for the current year, and a carry-over allowance of fifteen percent of the sum of the first two components. 7 U.S.C. § 1301(10)(A).

The marketing quota imposed by the AAA did not distinguish between peanuts used for domestic consumption, export, or crushing.

2. *The 1977 and 1981 Modifications.*

In 1977 and 1981, Congress passed the Food and Agriculture Act and the Agriculture and Food Act which temporarily sus-

---

**1.** The AAA defines crushing as "the processing of peanuts to tract oil for food uses and meal for feed uses...." 7 U.S.C. § 1358–1(e)(2).

pended much of the AAA and its subsequent modifications. This new law redefined the quota system to reflect changes in technology and the peanut market. First, the acts eliminated the acreage allotment system found in Section 358 of the AAA.[2] Second, the acts imposed a "poundage quota" rather than the former "marketing quota" imposed under the AAA. Unlike the marketing quota of the AAA, the new law placed a poundage quota only on peanuts designated for domestic edible use.[3] The statute defines domestic edible use peanuts as "quota peanuts." 7 U.S.C. § 1358–1(e)(3). All other peanuts produced for export or non-food use (for example, crushing) are not subject to a quota. The statute defines the peanuts not subject to a quota as "additional peanuts." *Id.* § 1358–1(e)(1). Finally, Congress imposed a two-tiered price support system that sets annual loan rates for quota peanuts (i.e. domestic edible use peanuts) and additional peanuts.[4]

Since 1977, Congress has continued to pass temporary laws that suspend the AAA and utilize the two-tiered system of price supports and a poundage quota applicable only to domestic edible use peanuts. Additional peanuts have not been subject to a quota since 1977. In 1981, Congress specifically suspended section 371 in the Agriculture and Food Act. As noted above, Section 371 provided the Secretary with a mechanism by which to increase or eliminate the marketing quota on peanuts if the supply would not equal the normal supply as defined in the AAA. As plaintiffs describe, the 1981 bill ended a four year transition period that began with the 1977 Act. Although the 1977 Act adopted the new poundage quota system, it also retained the acreage allotment system and used it in conjunction with the poundage quota. In the 1981 Act, however, all remnants of the old system were suspended, including section 371. S.Rep. No. 357, 101st

Cong., 2d Sess. 118–19 (1990), U.S.Code Cong. & Admin.News 1990, pp. 4656, 4774–4775.

### 3. *The 1996 FAIR Act.*

Congress' most recent temporary peanut production law is the 1996 FAIR Act. The Act in large part continues the system created in 1977 with minor modifications including reducing the quota loan rate and eliminating the minimum national poundage quota that had previously been set at 1,350,000 tons. 7 U.S.C. § 1358–1(a)(1); Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, § 155(i)(2) (1996) [hereinafter 1996 FAIR Act.]

The FAIR Act, like those temporary laws before it, suspends most provisions of the AAA. In 1981, Congress explicitly suspended section 371 of the AAA. Congress continued to list section 371 as a suspended section through the farm bill covering the 1995 crop. However, in the 1996 FAIR Act, Section 371 was not listed among the suspended sections of the AAA. Congress' failure to list Section 371 as a suspended section gives rise to the instant action.

In December of 1995, in anticipation of the passage of the FAIR Act, the Secretary set the 1996 poundage quota for domestic edible use peanuts at the statutory minimum of 1.35 million tons. On April 27, 1996, after Congress passed the Act, the Secretary adjusted the poundage quota downward to 1.1 million tons. The Secretary did not place a quota on "additional peanuts" as the FAIR Act did not authorize him to do so. Plaintiffs in this action contend that Congress' failure to suspend Section 371 requires the Secretary, pursuant to the terms of that section, to increase or eliminate the poundage quota placed on peanuts. Under plaintiffs' theory, the amount of quota peanuts produced under the poundage quota imposed by the Secretary

---

**2.** The acreage allotment system proved to be ineffective as a means of controlling production because of the dramatic increase in the production of peanuts per acre since the passage of the AAA.

**3.** In previous years, "domestic edible use" included peanuts used for seed. As defendant points out, one of the reforms of the 1996 FAIR Act is that the seed element is now separated out from the food element for a separate grant of

poundage quotas. *See* Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, § 155(i)(3)(A) (1996).

**4.** Naturally, the loan rate for quota peanuts is significantly higher than the loan rate for additional peanuts. The quota loan rate in the 1996 FAIR Act is $610 per ton; plaintiffs proffer that the loan rate for additional peanuts is $132 per ton.

will be insufficient to equal the normal supply as required by Section 371. Defendant United States Department of Agriculture ("USDA"), on the other hand, contends that Section 371 has no applicability in the two-tiered system with a poundage quota continued by the FAIR Act. Thus, defendant continues, Congress' failure to include it in the list of suspended sections is simply irrelevant. Defendant agrees that the amount of quota peanuts produced under the current poundage quota will not equal the normal supply because that term is defined to include not only peanuts for domestic edible use, but also all additional peanuts. Under the FAIR Act, additional peanuts are not subject to any quota.

## B. *The Parties.*

Plaintiff Loyd Hodges is a peanut farmer on two parcels of land straddling the border between Texas and New Mexico. Hodges alleges that he has already planted 250 acres of peanuts on his two farms; however, he seeks to plant an additional 250 acres if the quota is eliminated. Plaintiff Competitive Enterprise Institute ("CEI") is a non-profit, free market advocacy organization that promotes market-based alternatives and solutions to problems traditionally handled by government intervention. In this suit, CEI seeks to help consumers to obtain more peanuts at lower prices. Plaintiff Consumer Alert ("CA") is also a non-profit organization with over 5,000 individual members that works to defend and expand consumer choice in the marketplace. CA represents the interests of its members who desire more and cheaper peanuts and peanut products.

The defendant in this case, the USDA, is charged with, *inter alia,* the responsibility of implementing the peanut legislation. The Secretary sets the peanut quotas and support loan rates pursuant to the statutes.

Plaintiffs filed the instant action on May 1 of this year. In addition to their claim that the Secretary must conform to the requirements of Section 371, plaintiffs allege that defendant set the current quota in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. The APA requires that an agency follow certain procedures, such as advance notice and solicitation of public comments, prior to issuing a final agency rule. Plaintiffs argue that because the current quota was set without any notice or opportunity for comment, the quota must be set aside. Defendant takes the position that the FAIR Act exempted defendant from the requirements of the APA for setting this year's quota.

Before the court is plaintiffs' motion for a preliminary injunction requiring the Secretary to increase or eliminate, pursuant to the terms of Section 371 of the AAA, this year's quota announced in December of 1995 and modified on April 17, 1996. Apparently dissatisfied with defendant's proposed briefing schedule on the motion for a preliminary injunction, plaintiffs moved for a temporary restraining order on May 13. At a hearing on plaintiffs' motion on May 15, this court denied the temporary restraining order, finding that plaintiffs had been unable to show irreparable harm, a likelihood of success on the merits, or that the public interest favored granting the immediate relief.

## II

## DISCUSSION

As this court has often stated, the party seeking injunctive relief bears a substantial burden to show that the party is entitled to such an extraordinary remedy. *See, e.g., Herrera v. Riley,* 886 F.Supp. 45, 48 (D.D.C.1995). The court weighs four factors in determining whether preliminary injunctive relief is appropriate: (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable injury if injunctive relief is withheld; (3) the effect of the relief sought on other interested parties; and (4) the public interest. *Washington Metropolitan Transit Area Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Herrera,* 886 F.Supp. at 48. In considering this motion for injunctive relief, the court places more weight on plaintiffs' likelihood of success on the merits and the degree of irreparable injury. Plaintiffs need not prove their likelihood of success to a mathematical probability; it is sufficient for plaintiffs to show "either a high probability of success and some injury, or vice versa." *Herrera,* 886 F.Supp. at 48 (*quoting Cuomo v. United*

*States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985)).

## A. *Likelihood of Success on the Merits.*

### 1. *Applicability of Section 371.*

■ Plaintiffs first ask this court to compel defendants to comply with Section 371 of the AAA. The question presented is one of statutory construction; namely, whether section 371 is applicable to the 1996 FAIR Act. When considering a question of statutory construction, this court must attempt to "give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 (1993) (*citing Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3249–50, 73 L.Ed.2d 973 (1982)). Thus, any inquiry into the meaning and application of statutes must begin with the text.

#### a. *Plain Language.*

The plain language of the FAIR Act and Section 371, when read in conjunction with the other relevant portions of the AAA, precludes the application of Section 371 to the poundage quotas imposed by the Secretary.

■ A reading of the FAIR Act demonstrates that Congress continued the post–1977 trend of a two-tiered system of price supports with a quota imposed solely on domestic edible use peanuts. First, the FAIR Act, unlike the AAA, continues to distinguish between "quota peanuts" and "additional peanuts." 7 U.S.C. § 1358–1(e)(1) & (4).[5] Quota peanuts must be peanuts produced pursuant to the quota that are eligible for domestic edible use. *Id.* at § 1358–1(e)(4). Domestic edible use means "use for milling to produce domestic food peanuts...." *Id.* at § 1358–1(e)(3). The term "additional" peanuts, on the other hand, includes all other peanuts produced for any purpose that are not quota peanuts. Farmers can market additional peanuts for export or for crushing. Finally, section 1358–1(a)(1), as amended by the FAIR Act, gives the Secretary the authority to establish a "poundage quota for peanuts for each marketing year ... at a level that is equal to the quantity of peanuts (in tons) that the Secretary estimates will be devoted in each such marketing year to domestic edible use....." *Id.* at § 1358–1(a)(1).

Sections 155(a) and 155(b) of the FAIR Act give the Secretary explicit authority to set different price-support loan rates for quota peanuts and additional peanuts. Section 155(a) requires that the Secretary make the quota loans available at a rate of $610 per ton. 1996 FAIR Act, § 155(a)(1) & (2). Section 155(b) requires that the Secretary make loans available for additional peanuts "at such rates as the Secretary finds appropriate, taking into consideration the demand for peanut oil and peanut meal, expected prices of other vegetable oils and protein meals, and the demand for peanuts in foreign markets." *Id.* at § 155(b)(1). Plaintiffs proffer that this loan rate is $132 per ton.

The plain language of the sections cited above demonstrate that Congress continued a two-tiered price support system that places a quota only on one type of peanut, the domestic edible use peanut.

In sharp contrast to the current system, the peanut program initiated in 1938 contemplated one single "marketing quota" that limited the total amount of peanuts produced, regardless of their use. Section 358 of the AAA, the relevant portions of which have been suspended by the FAIR Act, contemplated a single, national marketing quota imposed by the Secretary on all peanuts. 7 U.S.C. § 1358(a). The statute made no distinction between domestic edible use peanuts and additional peanuts for either price-support loans or quota amounts. It is within this framework that Congress originally enacted section 371 in order to allow the Secretary to adjust the marketing quota to meet demand. Section 371 allows the Secretary to increase or eliminate the marketing quota if the quota will likely be insufficient to equal the "normal supply" for that year. 7 U.S.C. § 1371(a). As noted above, normal supply is the sum of the domestic consumption for the previous year, the estimated exports for the

---

**5.** The FAIR Act modifies and updates section 1358–1 of Title VII.

current year, and an allowance for carryover equal to fifteen percent of the sum of the first two components. *Id.* at § 1301(b)(10)(A).

Section 371's mechanism for adjusting the marketing quota in relation to the normal supply makes no sense in the two-tiered, poundage quota system imposed by the FAIR Act. Thus, by the plain language of both statutes, section 371 cannot apply. First, section 371 describes the quota as a marketing quota, not a poundage quota. When reading section 371 in light of the old, suspended section 358, the use of the term marketing quota makes perfect sense. Yet, the new system is described as a poundage quota system; the court concludes that Congress did not mince words when drafting the new statute, and thus section 371 cannot apply to the FAIR Act's poundage quota system.

Second, the court's conclusion is reinforced by section 371's use of the concept of normal supply. The quotas imposed under the FAIR Act limit only domestic edible use peanuts. Because domestic edible use is only one portion of the peanuts produced, the support-loan rate is statutorily set at $610 per ton, a sum markedly higher than the support rate set for additional peanuts. Normal supply, on the other hand, includes both domestic edible use peanuts as well as additional peanuts (using the definition of those terms from the FAIR Act). To say that section 371 could force the Secretary to increase the poundage quota to meet the demand for all peanuts, rather than the demand for domestic edible use peanuts, would subvert the entire distinction between the two-tiered price support system for domestic edible use peanuts and additional peanuts created by the FAIR Act. *Cf. Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, ——, 116 S.Ct. 286, 290, 133 L.Ed.2d 258 (1995) ("It is an elementary rule of construction that 'the act cannot be held to destroy itself.' *Texas*

& *Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 446, 27 S.Ct. 350 [357–58], 51 L.Ed. 553 (1907).").

It is also clear from their briefs that plaintiffs misunderstand the court's reliance on the term "poundage" as opposed to "marketing" quota. Plaintiffs devote a considerable portion of their briefings in this case to demonstrating the absence of a uniform distinction between the terms as used by Congress in the statutes. Plaintiffs' argument misses the point. Under the FAIR Act, only peanuts designated for domestic edible use are subject to a quota; under the definition of normal supply (as used by section 371), the quota referred to includes all peanuts produced for any use. The poundage quota set for a domestic edible use amount could never equal normal supply unless peanuts were not used for any other purpose, an unlikely possibility. The quota referred to in section 371 is different from the quota referred to in the FAIR Act.[6]

Moreover, the FAIR Act contains its own provision for ensuring that the poundage quota meets market demands. The Commodity Credit Corporation, the corporation charged with administering the quota and price-support system, is empowered through a buy-back provision to offer additional peanuts for domestic edible use when the market requires. 7 U.S.C. § 1359a(g).

Finally, Congress' explicit decision to eliminate the minimum poundage quota in section 358–1(a)(1) provides further evidence of the intent of Congress that section 371 should not apply. FAIR Act § 155(i)(2). Originally set as a limit on the Secretary's discretion for setting a low poundage quota, in the FAIR Act, Congress eliminated the minimum amount, allowing the Secretary to further reduce the poundage quota. It makes no sense for Congress to have eliminated the minimum poundage quota if, as plaintiffs al-

---

6. The court finds that it is plaintiffs who are disingenuous in their reply brief (at 7) when they argue that section 371 can be read in harmony with the FAIR Act. A quota imposed under the FAIR Act limits only peanuts for domestic edible use; section 371 would require a quota that includes all other uses. The FAIR Act requires a price support for quota peanuts well in excess of current prices. The Secretary could not feasibly raise the quota to comply with section 371 because of the price support requirement. Thus, the only probable way to comply with section 371 would be to eliminate the quota system entirely. Certainly plaintiffs cannot credibly maintain that section 371 can be read in harmony with the FAIR Act; it would destroy it.

lege, section 371 would require the Secretary to dramatically increase or eliminate the poundage quota to equal normal supply. Thus, when viewed, as a statute must be, in the context of the legislative scheme in which it is found, section 371 is antithetical to, and in contravention of, the scheme of the FAIR Act. *King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991).

### b. *Congress' Failure to Suspend Section 371.*

Unlike each farm bill since 1981, Congress failed to specifically suspend the operation of Section 371 in the FAIR Act. Plaintiffs contend that Congress' failure to suspend this provision requires the Secretary to apply it, in spite of the effect on the other provisions of the Act. Assuming as true defendant's argument that section 371 has no meaning under the FAIR Act's two-tiered, poundage quota scheme, plaintiffs believe that the court cannot simply disregard section 371 because of Congress' specific suspension of it in the three previous farm bills. Plaintiffs argue that this evidences an intent by Congress that section 371 should apply.

After considering Congress' failure to suspend section 371 in light of the context and language of all other relevant provisions of the FAIR Act, the court concludes that section 371 has no application under the FAIR Act. As discussed at length above, the plain language of the FAIR Act and section 371, when read in context, requires that section

371 not apply. Despite plaintiffs' citation to numerous cases stating that a court should avoid interpreting a statute to render a portion superfluous, the Supreme Court has also stated that an "act cannot be held to destroy itself." *Abilene Cotton Oil Co.,* 204 U.S. at 446, 27 S.Ct. at 358.[7] This is especially true where a party attempts to invoke a provision from a prior statute to thwart a recent enactment. To require the Secretary to eliminate the poundage quota on domestic edible use peanuts would eviscerate the distinction between quota peanuts and additional peanuts. Moreover, section 371 would destroy the two-tiered price support system envisioned by the FAIR Act. Any argument by plaintiffs that section 371 would not destroy the existing system is accorded no weight in light of their stated goal of eliminating the peanut quota system.[8] Plaintiffs' new description of section 371 as a "safety valve" for the Secretary simply does not square with the FAIR Act's scheme. A safety valve that would destroy the entire legislative scheme acts more like an incendiary device that would subvert Congress' intent to regulate peanut production. Such a result is inconsistent with the plain language of the Act and the intent of Congress.

### c. *Legislative History.*

Although the court does not find the plain language to be ambiguous, the legislative history of the FAIR Act further confirms that section 371 has no current application.

---

7. Plaintiffs' argument that section 371 can and in fact did it under the two-tiered poundage quota system from 1977 to 1981 is unpersuasive. First, plaintiffs answer their own argument by showing that section 371 lasted only as long as remnants of the old acreage allotment system remained in effect. As noted previously, the acreage allotment system remained in effect until the 1981 Act. Second, despite plaintiffs' claim of the existence of section 371 during the transition period, plaintiffs have failed to either cite to a single instance where the section was invoked, or show that during that time, the quota imposed was equal to normal supply. In other words, plaintiffs have failed to demonstrate that section 371 applied at all during this period illustrating further that it has no application under the current system.

8. Even more telling is plaintiffs' proffered justification for the absence of any indication by Congress that it intended to reinstate section 371. Plaintiffs proffer that perhaps the "conferees and leadership may have preferred to quietly reimpose § 1371 rather than to pin this choice on particular members thereby incurring the focused anger of a powerful special interest, i.e. quota owners." Plaintiffs go further to speculate that the inclusion of section 371 may have been an oversight. Plaintiffs' positions are irreconcilable and untenable. It is no secret that plaintiffs seek to eliminate the peanut program; all arguments regarding the synthesis of section 371 into the current system are disingenuous. This court, in evaluating the entire legislative scheme concludes that the intent of Congress as ascertained from the plain language of the FAIR Act is that section 371 has no place in the current system.

■ This court should resort to a consideration of legislative history if the literal reading of a statute is either ambiguous or would lead to an anomalous result. *See Suburban Transit Corp. v. Interstate Commerce Comm'n,* 784 F.2d 1129, 1130 (D.C.Cir.1986) ("A court interpreting a statute is bound by the plain meaning of the statutory words unless this would lead to 'absurd results....' *National Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Bd.,* 618 F.2d 819, 827 (D.C.Cir.1980)."); *Lancashire Coal Co. v. Sec'y of Labor,* 968 F.2d 388, 391 (3d Cir.1992). In the event that the language of the FAIR Act and section 371 were later deemed to be either ambiguous or creating an absurd result, the legislative history of the FAIR Act confirms that section 371 has no application under the present system.

Plaintiffs can point to no explicit portions of legislative history indicating that Congress intended section 371 to apply. Plaintiffs' legislative history argument is premised solely on Congress' rejection of forms of the 1996 FAIR Act that contained the suspension of section 371. The House version of the farm bill contained a provision suspending section 371; the Senate version did not have such a provision. Furthermore, the Senate rejected a substitute bill submitted by Senator Daschle that contained, among other provisions, the suspension. Finally, a floor amendment offered by Senator Heflin, which also contained the exemption, was never voted on. The conference committee ultimately accepted the Senate version. On these facts, plaintiffs argue that the legislative history requires that section 371 apply to the current system.

Plaintiffs' legislative analysis does little to advance their theory. Plaintiffs have no evidence that Congress expressly considered and rejected the suspension of section 371. That other versions containing the suspension were not adopted is, at best, ambiguous. Although Congress did adopt the version without the suspension, because the suspension of section 371 was merely one part of the alternate versions, the court cannot agree with plaintiffs when they conclude that Congress must have intended the section to apply. The court shall not ignore Congress' failure to suspend section 371; however, further inquiry into the legislative history is required.

The legislative history confirms that Congress intended to continue regulating the peanut industry by limiting the supply of domestic edible use peanuts. Because section 371 would destroy this system, the legislative history confirms that the section does not apply. First, the court examines the conference committee's report on the FAIR Act. *See American Jewish Congress v. Kreps,* 574 F.2d 624, 629 n. 36 (D.C.Cir.1978) ("Since the conclusions in the conference report were commended to the entire Congress, they carry greater weight than other of the legislative history."). The court agrees with defendant that the conference report confirms that Congress sought to continue the two-tiered price support system with a single poundage quota placed solely on domestic edible use peanuts. For example, the report clearly states that the Senate bill adopted by the committee meant to suspend "marketing quotas for peanuts." H.R. Conf. Rep. No. 2854, 104th Cong., 2d Sess. 349 (1996). Marketing quotas, as opposed to poundage quotas as used by the FAIR Act, refer to those quotas imposed under the AAA that placed a limit on all peanuts produced, regardless of usage. This explicit expression of legislative intent directly contradicts plaintiffs' assertion that section 371, which would in effect eliminate the poundage quota system in favor of the marketing quota system, should apply.

Second, the court considers differences between the version of the legislation actually enacted with prior, rejected versions. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 442–43, 107 S.Ct. 1207, 1218–19, 94 L.Ed.2d 434 (1987) (finding that the rejection of one proposal in favor of another is indicative of legislative intent).[9] On February 7, 1996, the

---

9. Plaintiffs undoubtedly would contend that under the reasoning of *Cardoza–Fonseca,* Congress' rejection of the version of the bill containing the suspension provision means that this court must apply it. However, in order for a rejection of a provision to have any meaning, it must be apparent that Congress considered including the provision. As discussed above, plaintiffs cannot

Senate voted to table an amendment by Senator Santorum that would have phased out the peanut program over the next seven years. 142 Cong. Rec. § 1018–38 (daily ed. Feb. 7, 1996) That amendment was, obviously, never adopted. Because the practical effect of requiring the Secretary to comply with section 371 would be the immediate elimination of the peanut quota program for this year, plaintiffs' position contradicts the apparent legislative intent of Congress to keep the peanut program.

The court also agrees with the defendant that tangential support to their position is provided by Congress' explicit rejection of the heading "marketing quota" for the heading of the section of the FAIR Act regarding quotas. Instead, Congress used the term "poundage quota" as the heading.[10] Maintaining the distinction between poundage quota and marketing quota reinforces the conclusion that Congress meant what it said in section 371 when it referred solely to marketing quotas.[11]

Finally, defendant argues that its interpretation of the FAIR Act is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Without giving any indication as to whether the interpretation of the FAIR Act is entitled to deference, the court does not reach this issue as it finds that the intent of Congress is clear that section 371 shall not apply to the current peanut program. *Id.* at 842–43, 104 S.Ct. at 2781–82; *United States v. Thompson*, 917 F.Supp. 22, 27 (D.D.C.1996).

Ultimately, the court finds that plaintiffs have attempted to exploit an apparent drafting loophole to do what Congress did not do: eliminate the peanut quota program. In its press release, plaintiff CEI indicated its intention to "crush" the · peanut program through this suit. The release continues:

> "Ending the peanut program would benefit consumers, manufacturers and the vast majority of producers," said Jonathan Tolman, policy analyst for the Competitive Enterprise Institute. "It is time the USDA stopped abusing consumers and the majority of farmers for the benefit of a select few quota barons." ... Not only is the existing quota system costly to consumers it is also fundamentally unfair to many peanut farmers.

CEI Press Release (undated). By their own admission, plaintiffs seek the elimination of the peanut program. Unfortunately for plaintiffs, Congress has not done so. The court will not permit plaintiffs to accomplish judicially what they have failed to accomplish in Congress.

The court is troubled by plaintiffs' recitation of the importance of judicial restraint so as to not tread on the province of the legislative branch. Admitting that the inclusion of section 371 in the FAIR Act may have been an oversight by Congress, plaintiffs would still argue to this court that it is defendant, rather than themselves, that is attempting to usurp legislative authority. To the contrary, plaintiffs' exploitation of this drafting loophole represents precisely what is to be avoided by this court when construing statutes. Plaintiffs passionately argue the positive consequences of eliminating the quota system. Indeed, plaintiffs also seek to invoke strong feelings of nationalism by claiming that im-

---

provide any indication that Congress expressly considered and rejected the suspension of section 371. Mere inclusion of the suspension of section 371 in a rejected version of the bill is not conclusive evidence that Congress considered that portion and rejected it.

**10.** The Senate version of the bill contained the heading of "market quota." The final version enacted by Congress uses the heading of "poundage quota."

**11.** The court finds marginally relevant a draft submitted by defendant of the FAIR Act allegedly created "shortly after" the conference committee had completed its work. That draft identifies section 371 as a suspended section. obviously, once the legislation was passed, this provision was missing. Congress has provided no explanation for the deletion of this provision. Because the version of the bill containing the suspension of section 371 was a draft, the court is hesitant to base its holding as to whether section 371 should apply on the draft. However, the court views the draft and the absence of any explanation regarding the elimination of the suspension of section 371 as further evidence that the omission was not, as plaintiffs contend, intended to engraft section 371 into the current peanut quota system.

ports threaten the very existence of the humble peanut farmers. "But such a policy argument is made to the wrong forum, and should be made instead to Congress." Pls.' Reply Brief at 19. This court will not become a vehicle for plaintiffs' desired legislative change.

The court accordingly finds that the existence of section 371 is irrelevant since it applies only to the marketing quota provisions of the AAA that is currently suspended. While not ignoring Congress' failure in the FAIR Act to suspend section 371, as it has since 1981, the court finds that the entire statute, on its face, makes clear that section 371 has no application. Finally, this conclusion is reinforced by the legislative history of the passage of the FAIR Act.

### 2. *Compliance with the APA.*

■ Plaintiffs next allege that the Secretary set the current poundage quota in violation of section 553 of the APA. Conceding that it did not comply with the APA, defendant contends that the FAIR Act exempted this decision from the APA. In section 161(d) of the FAIR Act, Congress expressly relieved the Secretary of the obligations under section 553 of the APA when issuing "such regulations as are necessary to implement [Title I of the FAIR Act]." 1996 FAIR Act, § 161(d). Section 155 of Title I creates the peanut program, including the quota provisions. Section 155(i) alters and amends section 1358–1 of Title VII, the provision directing the Secretary to establish a poundage quota. The court finds that the Secretary is exempted from the notice and comment requirements of the APA in setting the poundage quota for this year. The quota figure is itself a necessary regulation to implement section 155 in general and section 155(i) in particular.

Plaintiffs allege that because Congress placed a 90–day time limit on the exemption from the APA in section 161(d), Congress did not intend the setting of a quota, which occurs each year, to be exempt. The court disagrees. First, Congress was certainly aware of the importance of setting this year's quota immediately after the passage of the FAIR Act. Congress did not pass the Act until April of 1996, over three months after the prior farm bill had expired by its own terms. As plaintiff Hodges urges, once the planting season is over, he cannot plant more peanuts. Relieving the Secretary of the duty to comply with the burdensome procedures of the APA would seem tantamount to ensuring that a quota was promptly set. Second, the 90–day time limit reinforces the conclusion that the belated setting of this year's quota required immediate action, unfettered by the APA. The 90–day limit both allowed the Secretary to immediately set this year's quota, while ensuring compliance with the APA in the following years. Contrary to plaintiffs' assertions, such a rule makes perfect sense in light of Congress' delay in passing the FAIR Act.

Finally, plaintiffs argue that a similar provision in the 1990 farm bill requires that the Secretary comply with the APA under the FAIR Act. The 1990 bill exempted the Secretary from the APA's requirements when issuing "such regulations as are necessary to carry out this title *and the amendments made by this title.*" P.L. 101–624, § 809 (emphasis added). In contrast, the FAIR Act exempts the Secretary from the requirements of the APA when issuing "such regulations as are necessary to implement this title." 1996 FAIR Act, § 161(d). In light of this distinction, plaintiffs contend that the provision allowing the Secretary to set a quota, amended by the FAIR Act but not created by it, is not exempt from the APA. Plaintiffs' rigid reading of section 161(d) as compared to the 1990 provision is unavailing. Despite the difference between the two provisions, the court finds that the language of section 161(d) of the FAIR Act, on its face, exempts the quota-setting function from the requirements of the APA. Moreover, the 90–day provision as well as the circumstances surrounding the passage of the bill support the court's conclusion. Therefore, the court finds that the Secretary properly set the peanut quota without complying with the APA.

Accordingly, the court finds that plaintiffs have no likelihood of success on the merits of both claims in this action.

## B. *Irreparable Injury.*

■ "The basis of injunctive relief in the federal courts has ways been irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974) (*quoting Beacon Theatres. Inc. v. Westover,* 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)); *CityFed Financial Corp. v. Office of Thrift Supervision* 58 F.3d 738, 747 (D.C.Cir.1995). The harm alleged cannot be speculative, and it must be "both certain and great." *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985).

■ Plaintiff Hodges alleges that he would like to plant an additional 250 acres of peanuts in the event that the quota is lifted. Hodges will not, however, plant the additional peanuts until he is assured that the quota is lifted and he will get a higher price for the additional peanuts. First, the court does not agree that the granting of this injunction is necessary to preserve Hodges' profits. Under the Secretary's current view of the law, nothing in the statutes prevents Hodges from planting the additional 250 acres immediately. If Hodges is successful in this suit and the quota is eventually increased or lifted, he will be able to sell the extra peanuts produced for domestic edible use.[12] If he is not successful in this action, he can still market the extra peanuts as "additional peanuts" for export or crushing. Whether relief is granted now or sometime prior to the marketing of his harvest is simply irrelevant. At no point does Hodges allege that he is entitled to an immediate price-support loan for the additional peanuts he seeks to plant; indeed, such support would be contrary to plaintiffs' stated goals of free market peanut system. Hodges also does not allege that if he plants the additional acres and the quota is not lifted, he will lose money; he simply alleges that he will make more money if the quota is lifted on the extra peanuts. This is not an irreparable harm that can be prevented only by granting injunctive relief.

■ Second, even if this court were to grant the injunction and order the Secretary to comply with section 371, Hodges would still not know whether the quota would be lifted or eliminated within the planting season. Hodges alleges that this court must grant the injunction so he can plant within the next week or so before the planting season ends. However, under the very terms of section 371, the Secretary must give notice and opportunity for hearing.[13] The preliminary relief sought does not afford Hodges the ultimate answers he seeks.[14]

The court finds that whether or not Hodges will ultimately receive more money for the extra peanuts that he wants to plant is not affected by whether the court grants a preliminary injunction because he can plant the additional peanuts regardless of the poundage quota. If he later prevails, he may make more money. If he fails, he will market the peanuts as additional peanuts.

The remaining two plaintiffs have failed to show any irreparable injury that can be prevented by a preliminary injunction. They allege that defendant has denied them "the opportunity to participate in the decision process that let [sic] to the 1.1 million ton quota announced on April 17." The harm, if any, has already occurred. Whether the injunction is granted now or at a later date will not alter the alleged harm that these two plaintiffs were unable to participate in a decision that has already been made by defendant.

Although it is true in this jurisdiction that a preliminary injunction may still issue on a "relatively slight showing of irreparable injury, ... [the] moving party [must] demon-

---

12. Which of course will be much lower in light of the dramatic increase in supply.

13. Plaintiffs contend that the Secretary could immediately issue an interim final order and increase or eliminate the quota immediately. Yet, plaintiffs do not ask the court to enter such an order requiring the Secretary to do so.

14. Defendant also contends that Hodges lacks standing as his claimed injury will not be redressed by the court's decision in his favor. *See*

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Because an order requiring the Secretary to comply with section 371, defendant argues, does not guarantee that the quota will be lifted or increased, Hodges' injury is not likely to be redressed. At this stage, however, it appears likely that all plaintiffs have standing, and, were the court to grant the requested relief, their respective injuries would be redressed.

strate at least some injury." *CityFed Financial Corp.*, 58 F.3d at 747. In this case, plaintiffs have failed to show any irreparable injury that can only be prevented by granting this preliminary injunction.

### C. *Harm to Other Parties and the Public Interest.*

In light of the court's determination that plaintiffs have either a likelihood of success on the merits nor any colorable claim of an irreparable injury, the two remaining considerations are largely superfluous to a discussion of a preliminary injunction. However, these factors also counsel in favor of denying plaintiffs' motion for a preliminary injunction.

■■■ With respect to any harm to other parties, that is, harm to defendant, the court concludes that the relief sought would unfairly burden defendant. Because the court does not find any irreparable harm to plaintiff, the balance of hardship favors defendant who would be forced to radically, and probably irreversibly, alter its peanut program even before a final resolution on the merits of this case and an exhaustion of the appeals process.

Finally, the court rejects all arguments that requiring compliance with section 371 is in the public interest. Plaintiffs make no secret of the fact that they seek to end the quota system for peanuts. In their discussion of the public interest, plaintiffs point to negative impacts which they believe stem from governmental regulation of peanut farming and marketing. Plaintiffs also articulate the benefits which they believe would arise from the elimination that regulation. In their amicus brief, the Chocolate Manufacturers Association and the National Confectioners Association argue that the peanut program costs consumers and taxpayers money because of the artificially inflated market price of peanuts. Regardless of the merits or flaws in this position, their policy arguments are largely irrelevant. In the 1996 FAIR Act, Congress unequivocally continued a program of regulating peanut production and marketing. In spite of this, plaintiffs and amicus would have this court become their vehicle for accomplishing their legislative agenda. Determining policy is not within the province of the judiciary, and this court will not, under the guise of statutory construction, cross the line and impose its own legislative judgment as to the value of peanut regulation.

### D. *Plaintiffs' Rule 65(a)(2) Motion.*

As a result of the court's decision to grant the parties' Rule 65(a)(2) motion, plaintiffs' motion for a preliminary injunction is now moot. For the reasons stated above, however, the court finds that there is no dispute as to any material fact and the court shall now enter final judgment on the merits of plaintiffs' claims in favor of defendant.

### III

### CONCLUSION

Plaintiff Hodges' desire for a bigger payday and plaintiffs' CEI and CA's desire for cheaper Snickers bars are insufficient, as a matter of law, to override the clear intent of Congress to continue the regulation of peanut production and marketing. Section 371 of the AAA has no application to the current system of quotas and price supports created by the FAIR Act. After considering the various factors of a motion for a preliminary injunction, the court finds that plaintiffs have no likelihood of success on the merits. Indeed, the court concludes that there are no material issues of fact and thus shall enter final judgment in favor of defendant pursuant to the parties' Rule 65(a)(2) motion. Plaintiffs' motion for a preliminary injunction shall be denied as moot. Finally, the court shall dismiss this case with prejudice.