Reginald G. MOORE, et al., Plaintiffs,

v.

Lawrence SUMMERS, Secretary U.S. Department of the Treasury, Defendant.

No. CIV.A. 00–0953(RWR).

United States District Court, District of Columbia.

Sept. 8, 2000.

John Peter Relman, Christine R. Ladd, Relman & Associates, David James Shaffer, Karen Rapaport Esser, Ron Schmidt, Susan Tahernia, Thelen, Reid & Priest, LLP, Washington, D.C., for Plaintiff.

Brian J. Sonfield, United States Attorney's Office, Washington, D.C., for Defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs, ten African–American current and former special agents of the United States Secret Service purporting to represent a putative class of African–American special agents who have been employed by the United States Secret Service from January 1, 1974 to the present, have filed this action against the Treasury Secretary under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1994), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Among other things, plaintiffs claim that the Secret Service has engaged in a pattern and practice of racial discrimination in its promotion of black special agents from the GS–13 to the GS–14 level. Plaintiffs have filed an application for a preliminary injunction seeking to enjoin future use of the allegedly discriminatory promotion evaluation system pending resolution of this matter on the merits. Plaintiffs also claim that they have been retaliated against for engaging in protected equal employment opportunity ("EEO") activity and seek to enjoin future retaliation. Oral argument was held on September 1, 2000. I find that the plaintiffs' evidence thus far is insufficient to give rise to an inference that the performance evaluation system is discriminatory, but does demonstrate that some actions taken by the Secret Service since this litigation began are likely to chill other black agents from coming forward with their claims.

## BACKGROUND

Plaintiffs allege in their complaint that, over the course of past twenty-six years, the United States Secret Service has utilized a wide variety of racially discriminatory employment practices. Specifically, plaintiffs claim that the Secret Service's policies and practices have systematically discriminated against black special agents in the following areas: (1) placement in positions of GS–14 or above; (2) performance evaluations; (3) assignments to the position of acting supervisor; (4) transfers and assignments in general; (5) access to training; (6) assignment to undercover work; (7) hiring; (8) testing; (9) disciplinary policies; (10) awards and bonuses;

(11) overall work environment; (12) retaliation, and (13) other practices relating to the terms and conditions of employment. The primary target of plaintiffs' motion for a preliminary injunction is the Secret Service's performance evaluation system. A description of how that system operates is therefore in order.

I. *The Secret Service Special Agent Merit Promotion Plan*

The evaluation system at issue is known as the Secret Service Special Agent Merit Promotion Plan ("MPP"). Developed by a Secret Service Task Force in 1997, the MPP consists of three distinct parts: (1) a "First–Level" evaluation; (2) a "Peer Panel" evaluation; and (3) a "Second–Level" evaluation. (Burgess Decl., Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Opp'n") Ex. 1 at ¶¶ 6–9.) The First–Level evaluation counts for 50% of a special agent's total MPP score while the Peer Panel and Second–Level scores are weighted at 20% and 30% respectively. (*Id.* at ¶¶ 7–9.)

The MPP is used annually to evaluate special agents for promotion. In August, each GS–13 and GS–14 special agent who wishes to compete for a promotion is required to file a notice of his or her intent to compete. (*Id.* at ¶ 7.) However, not every GS–13 or GS–14 special agent is eligible to compete. A special agent must have completed three years "in grade" before he or she will be considered for a promotion. (*Id.* at ¶ 23.) For example, in order to compete for a promotion to the GS–14 level, a special agent must first have completed three years at the GS–13 level. Plaintiffs do not allege that this practice is discriminatory in any way.

Special agents who elect to compete for a promotion are then evaluated by their supervisors in the First–Level evaluation. The supervisor is required to rate each candidate using a scale of one to five on ten specific elements such as writing ability, problem solving, oral communication, knowledge of Secret Service rules and regulations, leadership and management ability, and negotiation skill. (*Id.* at ¶ 7; Moore Decl., Attach. to Pls.' Mem. Prelim. Inj. ("Pls.' Mem.") at ¶ 12.) After the supervisors complete their First–Level evaluation, they meet with the candidate to discuss the results. The candidate then has fifteen days in which to file a grievance challenging the supervisor's score. This process is normally completed by the end of August and counts for 50% of the agent's total MPP score. (Burgess Decl. at ¶ 7.) Plaintiffs do not allege that the First–Level evaluation is discriminatory.

Plaintiffs' challenge begins with the Peer Panel evaluation which is normally administered in September. During this portion of the MPP, which accounts for 20% of the special agent's total score, the candidate is evaluated by a panel of more senior special agents who are at least of the grade to which the candidate is seeking a promotion. So, if the competing special agent is seeking a promotion to GS–14, the peer panel would be comprised of special agents at the GS–14 level or above. The peer panel does not necessarily include the candidate's GS–14 supervisor. (*Id.* at ¶ 8; Moore Decl. at ¶ 15.)

The peer panel reviews a written qualification statement drafted by the candidate which details his or her experience in the "protection" and "investigations" areas. The panel then compares the candidate's statement to lists of specific "benchmark" tasks in each area. For example, the list for "protection" includes such tasks as assisting in the logistics for major events, serving as the lead advance agent for a visit by a notable foreign dignitary, and conducting a complex intelligence investigation. The panel then gives each candidate a protection score and an investigation score between one and seven. (Burgess Decl. at ¶ 8.)

The Second–Level evaluation begins in October. It is based on the following three elements: (1) two written qualifications statements drafted by the candidate

regarding "core competencies"; (2) the comments that the candidate's supervisor made in the First–Level evaluation; (3) the Peer Panel evaluation results. The written statements regarding core competencies are broken down into "leadership" and "influence and decision making." The evaluators, a panel of representatives from the office of each of the Secret Service's Assistant Directors, then compare the candidate's written statements to another list of benchmark skills. These benchmarks include responding to and assuming command during emergency situations, coordinating large-scale efforts with other organizations, and supervising other agents. After comparing the candidate's written statements with the benchmarks, the panel rates the candidate on a scale of one to seven in each of the two areas. (Burgess Decl. at ¶ 9; Moore Decl. at ¶ 17.)

After this process is completed, all competing special agents are notified in November of their initial composite MPP score which is on a 100 point scale. Candidates then have the option of filing a grievance challenging their score. Final scores for the current promotion cycle are expected to be distributed in early January of 2001. Those scores will then be used by candidates to bid on available positions throughout the 2001 calendar year. (Burgess Decl. at ¶¶ 10–11.)

When a position opens up, the Secret Service's Personnel Division announces a time period in which it will accept bids from interested special agents. After the period for accepting bids has closed, the Personnel Division creates a "Merit Promotion Certificate" for the vacant position. The Merit Promotion Certificate is a list of the bidding special agents with the top 30 MPP scores (including ties), or the top 25% of bidding special agents, whichever is greater. If there are less than 30 bids, all of the bidders are considered. (*Id.* at ¶ 14.)

The special agent with the highest MPP score is not guaranteed that he or she will be awarded the vacant position. Instead, a recommendation is made to the Director by an Advisory Board which consists of the Deputy Director, all seven of the Assistant Directors, and the Chief Counsel. The Advisory Board may recommend to the Director any individual listed on the Merit Promotion Certificate, or any competing special agent already at the grade level of the vacant position who is seeking a lateral transfer. The Director then selects who will fill the vacant position. (*Id.* at ¶ 15.) There are no written standards governing the Advisory Board in making its recommendation or the Director in making a selection. The only constraint on the Advisory Board and the Director is the MPP's requirement that all selections be made on a non-discriminatory basis and that the selection "not be based on any criteria that are not job related." (MPP, Pls.' Supp. Ex. C at 4.)

## II. *Plaintiffs' Allegations Regarding MPP*

In this suit, plaintiffs maintain that the Peer Panel and Second–Level evaluations, which together account for 50% of the composite MPP score, operate to the systematic detriment of black special agents. Specifically, plaintiffs allege that these two portions of the MPP allow half of the candidate's final score to be determined by the subjective preferences of evaluators who have never actually observed the candidate on the job. Plaintiffs also find fault with the absence of any published standards governing the Advisory Board or the Director in their choice of which agent on the Merit Promotion Certificate is selected to fill the vacant position. According to plaintiffs, this subjectivity has resulted in the proliferation of a "good old boys network" favoring white agents over black agents for promotions. Plaintiffs offer statistical and anecdotal evidence to support their allegations.

### A. *Statistical Evidence*

Plaintiffs' statistical evidence consists of an analysis of the representation of black

special agents at the GS–13 level as compared to the GS–14 level as of July 31, 1999. Black special agents comprised 10.8% (115 out of 1068) of the total number of special agents at the GS–13 level, but only 4.2% (12 out of 287) of all special agents at the GS–14 level. According to the plaintiffs' expert, Dr. Charles Mann, this difference in representation is statistically significant at the .000044 level using a one-tail exact binomial test, which corresponds to a difference of 4.08 standard deviations under the two-tail test utilized by the Supreme Court in *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). (Mann Decl., Attach. to Pls.' Mem. at ¶ 8.) In simpler terms, these figures mean that the probability that the observed disparity is due to chance is well under 1%.

### B. *Anecdotal Evidence*

Plaintiffs contend that the experience of their lead plaintiff, Special Agent Reginald "Ray" Moore, provides an egregious real life example of how the MPP works to prevent black special agents from advancing in the Secret Service. After serving seven years in the Secret Service, which included stints in the Secret Service's Miami and Baton Rouge Field Offices, Special Agent Moore was promoted to GS–13 in July of 1991. (Moore Decl. at ¶¶ 6–7.) He then served as the Course Director for the Investigative Tactics portion of the Special Agent Training Courses, and, beginning in 1994, was assigned to the Presidential Protective Detail ("PPD") where he became Acting Assistant Special Agent In Charge ("ATSAIC") for the Joint Operations Center at the White House. He was involuntarily transferred to the Secret Service's Dallas Field Office in October of 1999. (*Id.* at ¶¶ 2–5.)

Despite his credentials, Special Agent Moore has not been promoted to GS–14. As of January 1, 1999, he was ranked by the MPP as 47th out of 393 other eligible GS–13 level Special Agents, making him the highest rated black agent of all GS–13s

in the Secret Service. Moore claims that during 1999, the Secret Service promoted at least 92 other special agents who had lower overall performance rankings on the MPP than he did. (*Id.* at ¶ 8.)

According to plaintiffs, the discrimination against Moore became even more apparent during the 1999/2000 promotion cycle. On the MPP administered in 1999, Moore received a perfect 50 out of 50 in his First–Level evaluation. On the Peer Panel evaluation, he received 6.33 points out of 7.00 on the Investigation subpart and 6.67 points out of 7.00 on the Protection subpart. In the Second–Level evaluation, he received the maximum score of 7.00 on both the Leadership and Decision Making subparts. Moore's composite score of 98.57 out of a possible 100 points made him the 20th ranked agent out of 310 eligible GS–13 level special agents in the Secret Service and still, to his knowledge, the highest rated black agent. Yet, Moore did not receive a promotion while, according to him, other lower rated agents did. (*Id.* at ¶¶ 9, 13, 16, 18.)

Plaintiffs contend that the Secret Service's failure to promote Special Agent Moore strongly demonstrates the subjectivity and unfairness inherent in the current Secret Service promotion system. Specifically, plaintiffs allege that the Peer Panel and Second–Level evaluations are not guided by objective criteria. Special Agent Moore claims that, because the GS–14 supervisors on the peer panel and the Assistant Directors' representatives administering the Second–Level evaluation are unlikely to have actually observed the work of the candidate they are evaluating, they rely heavily on oral recommendations from the Special Agent In Charge ("SAIC") over the candidate being evaluated. According to Special Agent Moore, if the SAIC does not call the GS–14 supervisors on the peer panel or the Assistant Director to lobby for the candidate's promotion, "the candidate has virtually no chance of getting a Peer Panel or Second

Level Evaluation score that would be competitive for promotion." (*Id.* at ¶ 19.)

Moore maintains that this problem is exemplified by comparing his 1997/1998 and 1998/1999 performance evaluations. He claims that he received a low score on his 1997/1998 Second–Level evaluation because his SAIC did not call the Assistant Director to push for Moore's promotion, thereby contributing to a low composite score of 83 out of 100. For the 1998/1999 performance evaluation, by contrast, Moore's SAIC did call the Assistant Director and Moore received a high Second–Level score which contributed to a high overall score of 97.03. (*Id.* at ¶ 20.) Despite this high composite score, however, Moore was not promoted during the 1998/1999 promotion cycle. Nor was he promoted during the 1999/2000 promotion cycle when he received an even higher score of 98.57. (*Id.* at ¶ 21.) Thus, Special Agent Moore believes that the MPP score is "meaningless" and that "[t]he performance evaluations merely add a veneer of legitimacy to promotion selections that are, in fact, made via the racial spoils system of the 'good old boys' network." (*Id.*)

### III. *Retaliation Allegations*

Plaintiffs' second set of allegations charge that, since plaintiffs Moore, Summerour, and Turner filed an amended EEO class action complaint on February 24, 2000, the Secret Service has launched a "campaign of threats and intimidation" designed to undermine support for Black Agents of the Secret Service, Inc. ("BASS, Inc."), an organization of black Secret Service agents involved in promoting this lawsuit. (Pls.' Mem. at 24.) Plaintiffs also allege that the Secret Service has retaliated against the named plaintiffs.

In anticipation of the hearing on plaintiffs' motion for a preliminary injunction, I granted plaintiffs limited discovery on the issue of whether plaintiffs had in fact been retaliated against for engaging in protected EEO activity. Plaintiffs took the deposition of Secret Service designee Barbara Saliunas, Deputy Chief of the Secret Service's Personnel Division, which lasted five days and covered a variety of topics. Ms. Saliunas's deposition wound up not only addressing plaintiffs' wide-ranging allegations of retaliation, but also some of their allegations regarding the discriminatory nature of the MPP.

Plaintiffs' retaliation allegations and the defendant's responses to them can be summarized as follows:

### A. *The Alleged Campaign to Undermine BASS, Inc.*

BASS was formed in the early 1980s as a way for black agents to communicate with each other. (Cockell Decl., Def.'s Opp'n Ex. 4 at ¶¶ 2–5.) Special Agent Summerour describes it as "an informal network of social and professional support for African–American Secret Service Agents in the Secret Service." (Summerour Decl., Attach. to Pls.' Mem. at ¶ 12.) Until recently, BASS had no official organization and lacked a "formal agenda." (Second Spriggs Decl., Def.'s Opp'n Ex. 5 at ¶ 5.) In February of 2000, plaintiffs Turner, Moore, and Summerour decided to incorporate BASS so that it would become a "democratically elected representative organization to better address issues common to all African–American Secret Service Agents." (Summerour Decl. at ¶ 13.) The incorporation process involved "select[ing] interim officers and directors, prepar[ing] by-laws, and electing a board of directors and slate of officers." (*Id.*)

Plaintiffs allege that, since the filing of their amended EEO class action complaint on February 24, 2000, the Secret Service has launched a concerted "campaign" to discredit BASS, Inc. in the eyes of black special agents so that they will be discouraged from supporting both BASS, Inc. and this lawsuit. This alleged campaign consists mainly of the following: (1) a Secret Service-wide e-mail sent out by Brian Stafford, Director of the Secret Service, on February 25, 2000—the day after the

plaintiffs had filed their amended EEO complaint—stating, among other things, that he was "disappointed and troubled by the allegations" and that, "It is offensive for anyone to question our commitment to equal employment opportunity for all of our employees" (Pls.' Mem. Ex. A); (2) an e-mail from Assistant Director ("AD") Larry Cockell, who is black, sent to all BASS members hours after Director Stafford's e-mail in which Cockell questioned how the interim officers of BASS were going about incorporating BASS, Inc. (Pls.' Mem. Ex. B); (3) a March 15, 2000 e-mail from AD Cockell to all BASS members stating his belief that the interim leadership of BASS, Inc. had conducted a "coup d'etat" to illegitimately seize control of the organization without consulting the membership (Pls.Mem.Ex. C); (4) a May 12, 2000 e-mail from AD Cockell to all BASS members again expressing his disappointment in the direction that BASS was taking, disaffiliating himself from BASS, Inc., and adding "I choose not to buy into this sham" (Pls' Mem. Ex. E); (5) e-mail messages from other senior black agents to all BASS members declining nominations to be officers of BASS, Inc. even though such messages were supposed to be sent only to Special Agent Summerour, who was serving as interim secretary. (Pls.' Mem. Ex. F.)

Some of the e-mails declining nominations echoed AD Cockell's discontent with the new direction that BASS was taking. For instance, SAIC Wallace Shields stated in a May 13,2000 e-mail, "I am very saddened by what I see among agents (and former agents) that have come such a great distance together." He decried the "rift" that had developed, apologized to the "new agents" for what they were witnessing, and concluded, "I know that the last thing you need is to be associated with the kind of behavior that is now on the e-mail system." SAIC Jerry Wyatt's May 16, 2000 e-mail stated that he did not wish to be a part "of an organization that divides and alienates the majority of black agents for the sole purpose of furthering the indi-vidualistic agendas of a few.... [T]he justice you claim to seek appears to be 'Just-us', as black agents, being ridiculed."

Plaintiffs contend that these e-mails demonstrate that several senior black secret service agents have "circled the wagons" to discourage junior black special agents from supporting BASS, Inc. and plaintiffs' lawsuit. (Pls.' Mem. at 26–27.) To corroborate this allegation, they have submitted the declaration of Special Agent Cheryl Montgomery–White who alleges that, after attending a meeting in February of 2000 about the incorporation of BASS and this lawsuit, she had a conversation with SAIC Keith Prewitt. SAIC Prewitt, who is black, was also at the meeting. According to Special Agent Montgomery–White, during this conversation, SAIC Prewitt told her in substance that this lawsuit is "not going anywhere" because "all the Secret Service has to do is to put [AD] Larry Cockell, [AD] Danny Spriggs, SAIC Steve Carey, SAIC Gerry Wyatt, and me out front, and the lawsuit will go [away]." (Montgomery–White Decl., Attach. to Pls.' Notice of Filing at ¶ 51.) Plaintiffs have also noted that between May 28, 2000 and June 15, 2000, eight junior black Special Agents resigned from BASS and six of them have asked to be permanently removed from BASS's e-mail router. (Ivery Supp. Decl., Pls.'s Reply Supp. Prelim. Inj. Ex. 2 at Ex. A.)

In response to these allegations, defendant has submitted declarations from all of the senior black agents alleged to have sent e-mails geared toward undermining BASS, Inc. and this lawsuit. These declarations generally deny any effort influenced by the Director or otherwise to "circle the wagons" or to discourage black special agents from supporting BASS, Inc. AD Cockell maintains that his e-mails were simply a personal expression of (1) his frustration after some in the media had implied that he was involved in this lawsuit, (2) his discontent with what he perceived was a radical alteration in BASS

being conducted without consulting the general membership, and (3) his indignation after receiving an e-mail through the BASS e-mail router suggesting that he had been "bought off by a few high-profile promotions." (Cockell Decl. at ¶¶ 11–17; Saliunas Dep. at 824–53) As for the e-mails from other senior black agents rejecting nominations to be officers of BASS, Inc., the senders of those e-mails claim that they were doing nothing more than responding to an e-mail which warned them that if they did not respond within 72 hours, their names would be placed on the ballot. (Cockell Decl. at ¶¶ 16–17; Spriggs Decl., Def.'s Opp'n Ex. 5 at ¶ 7; Carey Decl., Def.' Opp'n Ex. 16 at ¶¶ 5–6; Rowe Decl. Def.'s Opp'n Ex. 17 at ¶¶ 5–8; Hill Decl., Def.'s Opp'n Ex. 18 at ¶¶ 4–6; Rodgers Decl., Def.'s Opp'n Ex. 19 at ¶¶ 7–10; Mapp Decl., Def.'s Opp'n Ex. 20 at ¶¶ 5–7; Shields Decl., Def.'s Opp'n Ex. 21 at ¶¶ 5–9; Carter Decl., Def.'s Opp'n Ex. 22 at ¶¶ 5–8; Wyatt Decl., Def.'s Opp'n Ex. 23 at ¶ 5.) Further, defendant contends that the senior black agents who were critical of BASS, Inc. were not attempting to undermine it or this litigation, but were merely expressing their own personal concern and disappointment over the course that BASS, Inc. was taking.

Defendant has submitted no such explanatory declaration from Director Stafford concerning his e-mail. However, defendant denies that Director Stafford intended his February 25, 2000 message to be intimidating and claims that the e-mail was designed in large part to reaffirm the Secret Service's commitment to equal employment opportunities. (Saliunas Dep. at 778.)

### B. *Special Agent Leroy Hendrix*

Special Agent Leroy Hendrix has been a member of the Secret Service since May of 1989 and is currently assigned to the Vice Presidential Protective Division ("VPPD"). He alleges that he has been denied a position as a "whip" on the VPPD and a promotion because of his complaints of discrimination within the VPPD and his participation in this lawsuit.

A whip is a GS–13 level informal supervisor of a protective shift who acts as a supervisor in the absence of the actual shift leader, who is a GS–14 special agent. There are usually three whips on a particular detail. According to plaintiffs, obtaining a whip position drastically increases one's chances for a promotion because of the supervisory responsibilities involved. (Hendrix Decl., Attach. to Pls.' Mem. at ¶ 15.)

Special Agent Hendrix claims that, on March 8, 2000, he sent an e-mail to the SAIC of the VPPD, Special Agent William Pickle, which complained about the lack of minority and females agents assigned to whip positions on the VPPD and expressed the belief that lesser qualified white male agents were being promoted instead. Hendrix and Pickle had a meeting the next day, barely two weeks after Director Stafford's e-mail expressing offense and disappointment at the allegations of discrimination. At the meeting, Hendrix claims that Pickle expressed his "disappointment" in Hendrix's belief that whip assignments were made in a discriminatory fashion. Pickle also allegedly explained that whips would in the future be chosen based primarily on the shift leader's vote and also noted that white agents had "complained" that three "number one" whips were minorities. This alleged comment lead Special Agent Hendrix to believe that a racial quota system had been instituted limiting the number of minorities who would be made whips. (*Id.* at ¶¶ 22–26.)

In response to Hendrix's questions about his own personal situation, Special Agent Pickle allegedly responded that he was "certain" that Hendrix would be made a whip. However, Hendrix has not been made a whip since and he claims that others who were made whips, including women and minorities, are less qualified than he is. (*Id.* at ¶¶ 28–30.)

Plaintiffs have proffered additional evidence which, according to them, demonstrates that the Secret Service's failure to make Hendrix a whip was in retaliation for his complaints about the purported racial quota system on the VPPD. Specifically, plaintiffs allege that Dawn Naples, a Special Agent on the VPPD, had a conversation with Hendrix during which she mentioned speaking to VPPD Deputy Special Agent In Charge ("DSAIC") Tony Zotto. Zotto, who was then a primary supervisor for Hendrix's detail, allegedly told Naples that Hendrix might have been promoted to whip had he not "gone over [Zotto's] head" to complain about the alleged racial quota system to SAIC Pickle. (*Id.* at ¶ 33.) Hendrix also maintains that Zotto had previously made comments which led Hendrix to believe that he would in fact be promoted. (*Id.* at ¶ 34.)

Aside from his non-assignment to a whip position, Special Agent Hendrix cites his non-promotion to a Resident Agent ("RA") position in Fort Meyers, Florida as another incident of retaliation. Special Agent Hendrix bid on the position in March of 2000 and was not selected. He claims that the agent who was selected over him is less qualified for the position. (*Id.* at ¶ 36.)

Special Agent Hendrix also alleges that he was retaliated against after a May 3, 2000 press conference he attended which announced the filing of this lawsuit. According to Hendrix, the next day, ATSAIC Lee Aivazis intentionally assigned Hendrix to do "errand boy" tasks, such as retrieving gun holsters from a company in Virginia, which were normally assigned to junior agents. (*Id.* at ¶¶ 37–39.)

Defendant contests all of Special Agent Hendrix's allegations. First, Special Agent Naples and DSAIC Zotto have submitted declarations in which they reject Special Agent Hendrix's version of events. Specifically, Special Agent Naples denies ever telling Hendrix that DSAIC Zotto had said that Hendrix would have been promoted had he not gone over Zotto's head. (Naples Decl., Def.'s Opp'n Ex. 8 at ¶ 3.) DSAIC Zotto also denies ever telling Special Agent Naples as much. (Zotto Decl., Def.'s Opp'n Ex. 9 at ¶ 3.)

Second, SAIC Pickle denies that he told Hendrix during the March 9 meeting that the whip selection procedures were changing,[1] or that he was "certain" that Hendrix would get a whip assignment. (Pickle Decl., Def.'s Opp'n Ex. 7 at ¶ 8.) SAIC Pickle also denies that there is any "quota system" in selecting whips and notes that, of the three special agents chosen for whip positions since March 9, 2000, two are black and one of the two is female. (*Id.* at ¶ 9.) However, SAIC Pickle did not deny saying that he was "disappointed" that Hendrix believed that a racial quota system was used in selecting whips.

Third, the Secret Service officials who recommended that other agents be made whips have stated that they were unaware that Special Agent Hendrix had engaged in any protected EEO activity at the time those recommendations were made. These supervisors also cited Special Agent Hendrix's allegedly habitual tardiness as an additional reason for why he was not selected to be a whip. (Knoll Decl. Def.'s Supp. Ex. 10 at ¶¶ 5, 7–8; Wyche Decl., Def.'s Supp. Ex. 12 at ¶¶ 5–8; Roberts Decl., Def.'s Supp. Ex. 13 at ¶¶ 5–8.)

Fourth, defendant submitted the declaration of AD James E. Bauer, who was responsible for selecting the special agent

---

1. According to SAIC Pickle, when a whip vacancy occurs, the GS–15 Assistant Special Agent in Charge ("ASAIC") for the Manpower Section asks the ATSAICs, who generally work as shift leaders supervising the GS–13s, to provide a list of five GS–13s working on the VPPD who should be considered for a whip position. GS–13s who have been with the VPPD for at least two years are normally eligible for consideration. The list is then delivered to SAIC Pickle, who decides along with his deputy who will fill the vacant whip position. SAIC Pickle has indicated that whip selections have, to his recollection, always been consistent with the consensus of the ATSAICs. (Pickle Decl. at ¶ 7.)

for the Fort Meyers RA position. AD Bauer claims that, at the time he made the selection, he was unaware that Special Agent Hendrix had made an allegation of discrimination within the VPPD or that Hendrix was involved in this lawsuit. AD Bauer also indicated that the special agent selected was more qualified for the position because (1) he had been in the Secret Service five years longer than Hendrix had, and (2) he also had proficiency in Spanish which Bauer believed would be useful. (Bauer Decl., Def.'s Supp. Ex. 2 at ¶¶ 3–4.)

As for Hendrix's "errand boy" allegation, ATSAIC Aivazis has submitted a declaration explaining that he assigned Special Agent Hendrix to the tasks at issue because Hendrix was several hours late for work that day without authorization. Aivazis also asserts that "picking up gun holsters is a routine task which both Special Agent Hendrix and I have previously performed." (Second Aivazis Decl., Def.'s Supp. Ex. 9 at ¶ 4.) Finally, Aivazis disavows that he was motivated by retaliatory intent.

### C. *Special Agent Luther Ivery*

Special Agent Luther Ivery contends that he too has been retaliated against for engaging in protected EEO activity. First, he alleges that on March 9, 2000, the SAIC of the Dignitary Protective Division, Steve Carey, allegedly told Ivery that AD Danny Spriggs, who is black, was "disappointed" when he heard that Ivery was involved in the EEO complaint underlying this case. SAIC Carey, who is also black, then allegedly warned Ivery, "If I were you, I wouldn't be the one upfront." (Ivery Decl., Attach to Pls.' Mem. at ¶ 14.)

Ivery also alleges that, since joining this litigation, he has not been promoted despite scoring a 93.8 on the MPP. He maintains that other agents, both white and black, with far lower MPP scores have been promoted instead. (*Id.* at ¶¶ 10–15.)

Defendant counters that the reasons for Special Agent Ivery's non-promotion have nothing to do with race or his participation in this lawsuit. According to defendant, since March 9, 2000, Ivery has bid on three GS–14 positions which he was not awarded. For two, Ivery was not among the top thirty GS–13s who bid so his name was not placed on the Merit Promotion Certificate. For the third, Ivery was ranked thirtieth and a special agent with a higher MPP score was selected for the promotion. (Burgess Decl. at ¶¶ 18–21.) In addition, AD Spriggs claims to have harbored doubts about Special Agent Ivery's leadership abilities because of a domestic incident that had occurred several years earlier. (Saliunas Dep., Pls.' Supp. Ex. E at 205; Def.'s Supplemental Mem. ("Def.'s Supp.") Ex. 21.) However, the defendant has never denied in filings or in oral argument that AD Spriggs said he was "disappointed" upon hearing that Ivery was involved in this matter.

### D. *Special Agent John Turner*

Special Agent John Turner is the second highest rated GS–13 level black special agent on the MPP behind Special Agent Moore, having scored a 98.10 on the last MPP. He is currently assigned to the Protective Intelligence Squad at the Washington Field Office. He has served twice in ATSAIC positions which are normally assigned to GS–14s. He alleges that he has not been promoted to GS–14 out of retaliation for his participation in this lawsuit. He also contends that he was involuntarily transferred to his current position, which purportedly has "significantly less responsibilities" than his previous assignment, approximately one week after this action was filed on May 3, 2000. (Turner Decl., Attach to Pls.'s Mem. Supp. Prelim. Inj. at ¶¶ 4, 5, 10.)

Defendant maintains that Special Agent Turner's transfer was not the result of retaliation, but rather part of a routine office rotation. According to defendant, Turner was one of thirty other agents at the Washington Field Office who were

reassigned at the same time. (Dowling Decl., Def.'s Opp'n Ex. 11 at ¶ 6.) Defendant contends that Turner was among the thirty selected because he had already spent a lengthy period of time at his previous post and the Washington Field Office needed a senior GS–13 agent in the Protective Intelligence squad. (Ediger Decl., Def.'s Supp. Ex. 7 at ¶ 9.) According to defendant, Turner was also recently offered the position of group leader of his squad, which would give him additional responsibilities. (Saliunas Dep. at 366.) Plaintiffs' counsel confirmed at oral argument that Special Agent Turner has accepted that position and will assume it shortly. With respect to the two non-promotions, defendant contends that the two agents who were promoted instead of Turner were better qualified.

### E. *Special Agent Ray Moore*

Special Agent Moore maintains that he has been retaliated against throughout the EEO process. For instance, he was involuntarily transferred to the Dallas Field Office in October of 1999, days after he filed a formal class complaint in this matter. He alleges that, after his transfer, SAIC Jerry Patton, who is black, told Moore that he deserved to be promoted and would see to it that he was. However, on March 13, 2000, a newspaper article appeared in the *Dallas Morning News* discussing Moore's role as lead plaintiff in this lawsuit. According to Moore, a coworker in the Dallas Field Office told him that SAIC Patton no longer wanted Moore to be promoted because of the article. Moore was not promoted even though, according to him, his job performance rating was higher than those who were. (Moore Decl. at ¶ 23.) Moore also alleges that he has bid on forty-one other promotions since this litigation began and has not been awarded any.

Defendant denies that any of the actions Special Agent Moore has cited were motivated by retaliation. He has proffered evidence showing that Special Agent Moore's transfer to Dallas had been formalized in July of 1999, well before the filing of the formal class complaint in October. (Def.'s Opp'n Exs. 13–14.) SAIC Patton denies that he withdrew his support for Special Agent Moore after the *Dallas Morning News* article was published and also denies that he ever told Moore that he deserved to be promoted. (Patton Decl., Def.'s Opp'n Ex. 12 at ¶¶ 3–9.) Defendant asserts that the individual who was promoted, a Hispanic agent, had a higher MPP score than Moore and was Patton's first choice. (Burgess Decl. at ¶ 25.) With respect to the roughly forty non-promotions Moore has cited, the defendant's agency designee was questioned about the reasons for these non-promotions during her deposition. One of the more common reasons given was Director Stafford's policy against moving agents at taxpayer expense who had recently been moved to their current position. (Saliunas Dep. at 155–57, 186.) Another was the Director's and Advisory Board's alleged preference for laterally transferring GS–14s into vacant GS–14 positions rather than promoting a GS–13. (*Id.* at 131.) Plaintiffs note in response that neither of these two criteria is explicitly mentioned in the MPP.

Plaintiffs also allege that Special Agent Moore has been retaliated against since the filing of plaintiffs' motion for a preliminary injunction. On June 1, 2000, someone mailed an anonymous complaint against Special Agent Moore to the Secret Service' Office of Inspection here in Washington, accusing him of misusing government telephones and computers to further his lawsuit against the Secret Service. The Office of Inspection is normally responsible for investigating wrongdoing on the part of Secret Service employees. However, the Secret Service turned over the letter to the Treasury Department's Office of the Inspector General ("OIG"), an entity outside the Secret Service, citing the potential conflict of interest due to this litigation. (Clark Decl., Def.'s Supp. Ex.

16 at ¶¶ 2–3; Saliunas Dep. at 318–19, 429–430, 440.) OIG then conducted an investigation, produced a report, and no disciplinary action was taken against Special Agent Moore. (Saliunas Dep. at 726–28; Pls.' Supp. Ex. J.)

### F. *Special Agent Yvette Summerour*

Special Agent Summerour claims that, on March 10, 2000, she was denied a requested transfer from the PPD to the Secret Service's Major Events Division after becoming involved in this case. She further alleges that her supervisor, DSAIC Carl Truscott, told her that while she would not be transferred, other agents on the PPD who had less experience would still be given the opportunity for the transfer. Summerour claims that Truscott also told her that he did not think that any of her requested transfers were likely to succeed and that he opposed her discrimination claims. Summerour alleges that she felt as though she had no choice but to accept a lateral transfer to the Protective Intelligence Division on May 21, 2000. Moreover, Summerour, who is also the highest ranked black female on the MPP, was recently denied a promotion. (Summerour Decl. at ¶¶ 8–9, 16, 18.)

In response to Special Agent Summerour's allegations, defendant has produced the declaration of AD Barbara Riggs, who oversees the Secret Service's Intelligence Division. AD Riggs states that Summerour had phoned Riggs, "personally asked" for her reassignment, and did not indicate a preference for the Major Events Division. AD Riggs believes that Summerour's assignment to the Intelligence Division is a "positive career move for her." (Riggs Decl., Def.'s Opp'n Ex. 15 at ¶ 2.) Plaintiffs contend that Special Agent Summerour called AD Riggs only after Summerour became convinced that her other options had been foreclosed.

DSAIC Truscott also submitted a declaration. He states that he met with Special Agent Summerour as part of his routine practice of speaking with agent's who are approaching the end of their five-year tenure with the PPD. He indicated that he was merely attempting to encourage Special Agent Summerour to make "realistic selections given the relative number of positions available in the various offices within the Secret Service." He adds that he does not make any reselection assignments himself, but rather merely provides advice and has neither discouraged Special Agent Summerour from bringing her discrimination claims nor retaliated against her. (Truscott Decl., Def.'s Supp. Ex. 5 at ¶¶ 3–4.)

### DISCUSSION

Plaintiffs' application for a preliminary injunction seeks two general forms of relief. First, plaintiffs seek to enjoin the use of MPP Peer Panel and Second–Level evaluations in personnel decisions regarding promotions, transfers and/or assignments. Second, plaintiffs seek an injunction against further acts of retaliation and intimidation which would include: (1) a ban on any further reprisals and acts of intimidation/retaliation against the plaintiffs and the class; (2) a Secret Service-wide e-mail affirming that no retaliatory action will be taken against anyone who participates in BASS, Inc., or this lawsuit, and that the Secret Service will discipline anyone who does retaliate; and (3) reasonable notification to plaintiffs' counsel concerning any future transfers or employment actions involving the named plaintiffs.

### I. *Standard of Review*

■ A preliminary injunction is an extraordinary form of relief not granted lightly. Traditionally, the plaintiff "must show 1) a substantial likelihood of success on the merits, 2) that [he or she] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d

1060, 1066 (D.C.Cir.1998) (internal quotations and citation omitted); *see also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 923 (D.C.Cir.1958). As the D.C. Circuit has held, "[t]hese factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C.Cir.1998).

Defendant argues, based on the Supreme Court's decision in *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), that plaintiffs must make a heightened showing of irreparable harm because they are seeking to enjoin federal personnel practices. In *Sampson*, the Supreme Court ruled that a federal court could preliminarily enjoin a probationary federal employee's discharge pending the completion of her administrative appeal. However, the Court also held that the traditional standards governing preliminary injunctions were inappropriate due to the "historical denial of all equitable relief by the federal courts" in past employment cases, coupled with the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs ... and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee ...." *Sampson*, 415 U.S. at 83–84, 94 S.Ct. 937 (internal quotations and citation omitted). Thus, a plaintiff seeking to stay a government personnel decision must "make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Id.* at 84, 94 S.Ct. 937.

When presented with the issue of whether this heightened irreparable harm standard applies in Title VII cases, the D.C. Circuit sidestepped it. *See Wagner v. Taylor*, 836 F.2d 566, 575 & n. 66 (D.C.Cir.

1987). However, another member of this Court has addressed the question, explicitly holding "that a more stringent showing of irreparable injury is required when a plaintiff, even in a Title VII case, seeks a preliminary injunction against the federal government in the personnel arena." *Bonds v. Heyman*, 950 F.Supp. 1202, 1212 (D.D.C.1997) (Lamberth, J.). To make this "more stringent showing," the plaintiff must demonstrate "extraordinary irreparable injury" or "that an adverse personnel action is likely to have a chilling effect on other employees who, after witnessing their fellow co-worker's discharge or dismissal, would now refuse to file claims in fear of reprisals ...." *Id.* at 1214–15.

Here, regardless of whether this heightened standard should apply, plaintiffs have not met even the traditional standard with respect to their claim of discriminatory promotions. I also find, however, that plaintiffs have met both the traditional and the heightened standard for preliminary injunctive relief with respect to their claim that the Secret Service has engaged in activity having a chilling effect on the prospective plaintiffs' exercise of their Title VII rights.

## II. *Allegations that the MPP is Discriminatory*

### A. *Likelihood of Success on the Merits*

 Plaintiffs allege that Peer Panel and Second–Level evaluations violate Title VII under two separate theories of liability. First, plaintiffs bring a "disparate treatment" claim (also known as a "pattern and practice" claim in the class action context) in which they allege that the operation of the MPP manifests an intent on the part of the Secret Service to discriminate against black special agents as a class. To prevail on such a claim, "[p]roof of illicit motive is essential, but, especially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group." *Segar v.*

*Smith,* 738 F.2d 1249, 1265–66 (D.C.Cir. 1984) (citing *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 & n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

■ Plaintiffs also bring a "disparate impact" claim. Under this theory, plaintiffs are not required to prove discriminatory motive. Rather, it is enough for them to show that the challenged employment practices, though "facially neutral in their treatment of different groups . . . in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843. As the D.C. Circuit has explained, the "classic" example of a disparate impact claim occurs when the "plaintiffs allege that the defendant based employment decisions on results of a test for which members of one [race] on average received lower scores than members of the other [race]." *Palmer v. Shultz,* 815 F.2d 84, 90 (D.C.Cir.1987) (citations omitted).

Though the disparate treatment and disparate impact theories share some similarities, the sequence and allocations of burdens of proof differ in important ways. Because discriminatory intent is the keystone of any disparate treatment claim, "the plaintiff class will likely try to meet this ultimate burden by proving a disparity sufficient to permit an inference of discrimination [so that] plaintiff must carry the burden of persuasion as to the existence of the disparity." *Segar,* 738 F.2d at 1267. Disparate impact claims, by contrast, do not seek to root out discriminatory intent, but rather aim at facially neutral practices that adversely affect minorities without a legitimate business justification. As such, "plaintiffs bear the burden of persuasion as to the existence of a race-related disparity caused by an employment practice, but, once plaintiffs have made this showing, the employer bears the burden of persuasion as to the business necessity of the practice." *Id.* (citation omitted).

As the D.C. Circuit has noted, "an important point of convergence" between disparate treatment and disparate impact claims exists in class actions such as this one. *Id.* Because both disparate treatment and disparate impact claims "are attacks on the systemic results of employment practices . . . proof of each claim will involve a showing of disparity between the minority and majority groups in an employer's workforce." *Id.* Thus, under both theories of liability, the plaintiffs must make a *prima facie* showing that a racial disparity exists.

The centerpiece of such a showing is usually a statistical analysis demonstrating "a disparity in the position of members of the plaintiff class and comparably qualified whites." *Id.* Anecdotal evidence regarding particular instances of alleged discrimination is frequently used to put some flesh on the bare-boned numbers. If the plaintiffs are able to meet their initial burden of establishing that a disparity does exist, the employer can seek to refute the conclusion that a disparity exists, usually by introducing its own statistical evidence. *See id.* The defendant can also mount "an explanatory defense" which amounts to "a claim that the observed disparity has not resulted from illegal discrimination." *Id.* at 1267–68. If the defendant succeeds in rebutting the inference of discrimination, then it is appropriate to apply disparate impact analysis in order to determine whether the facially neutral barriers hindering minorities' advancement are job-related. *See id.* at 1272 n. 19 ("Disparate impact will apply in the pattern or practice case only after plaintiffs have made a sufficient initial showing of disparity between groups that appear to be comparably qualified, and after it has been decided that the employer's explanation rebuts the disparate treatment claim.").

■ Here, it is unnecessary to proceed past the first step of the disparate treatment analysis because plaintiffs have not proffered sufficient evidence demonstrating that a disparity exists in order to make

out a *prima facie* case. Dr. Mann's statistical analysis, which is based on a single statistic derived from one year of employment figures, revealed that the difference between the percentage of black GS–13s (10.8%) and black GS–14s (4.2%) was statistically significant using a one-tail test at the .000044 level. This significance level corresponded to a difference of 4.08 standard deviations under a two-tailed test.[2] Such a small level of significance normally suggests that the observed disparity was caused by something other than chance, therefore giving rise to a rebuttable presumption of discrimination. *See Palmer*, 815 F.2d at 92 (noting that a finding of significance at the .05 level, which corresponds to a difference of 1.96 standard deviations under a two-tailed test, is significant enough to create an inference of discrimination); *Segar*, 738 F.2d at 1282.

Dr. Mann's analysis, however, is based on a critical, and potentially erroneous, assumption. Dr. Mann reasoned that *"[a]ssuming* the representation of African–Americans among the GS–13 [special agents] as an estimate of the rate at which African–Americans should be represented among GS–14 [special agents]," the expected percentage of black GS–14s is much higher than what was actually observed. (Mann Decl. at ¶8) (emphasis added). This assumption may not be a safe one to make under both the law of this Circuit and the facts of this case.

■ It is well-settled that, to establish a *prima facie* case, plaintiffs' proof that a racial disparity exists must "eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation,

the disparity more likely than not resulted from illegal discrimination." *Segar*, 738 F.2d at 1274 (citing *Teamsters*, 431 U.S. at 368, 97 S.Ct. 1843). Because the most common nondiscriminatory reason for a systemic disparity in treatment is ineligibility among the minority group members, *id.*, the plaintiffs' statistical evidence must be "based upon a comparison of those [black special agents] *eligible for selection* who were actually selected with the corresponding proportion of eligible [white special agents] who were actually selected." *Palmer*, 815 F.2d at 90 (emphasis added). *See also Segar*, 738 F.2d at 1274 (panel opinion); *id.* at 1299 (concurring opinion) (noting that plaintiffs' statistics must "compare the employer's relevant work force with the qualified population in the relevant labor market") (internal quotations and citations omitted). Put yet another way, "[i]t is not enough ... to prove that blacks form a smaller percentage of the managers than they do of all employees in a given firm, unless there is also a showing that within the black employees the portion of persons qualified for the higher type of position is significantly greater than the portion now holding those jobs." *Metrocare v. Washington Metro. Area Transit Auth.*, 679 F.2d 922, 930 (D.C.Cir.1982).

In this case, a comparison of the percentage of black GS–13s to the percentage of black GS–14s is not meaningful unless all of the black GS–13s are eligible to be promoted to GS–14. The record does not establish that prerequisite. It is undisputed that, in order to be eligible for a promotion, a special agent must have first completed three years "in grade." (Burgess Decl. at ¶23.) Moreover, it is also

---

**2.** The D.C. Circuit has expressed a preference for two-tailed tests over one-tailed tests. *See Palmer*, 815 F.2d at 95. This preference is based on the difference between the two types of tests and their relationship to the purposes of Title VII. A one-tailed test reveals whether, under the facts of this case, blacks are treated at least as well as or better than whites. *See id.* at 95. However, a one-tail test does not indicate whether whites are treated worse

than blacks. A two-tailed test, by contrast, demonstrates whether blacks and whites were treated equally, taking into account both whether whites are treated as well as or better than blacks and vice versa. *See id.* Because the purpose of Title VII is to assure that people are treated equally, and not that one group is treated at least as well as or better than another, the D.C. Circuit prefers two-tailed tests. *See id.*

undisputed that eligible special agents must bid to be considered for a promotion. This suggests that, for reasons presumably unrelated to race, not every black GS–13 is eligible to be promoted to GS–14, and of those who are eligible, not all are considered for a promotion. Plaintiffs do not contend otherwise.

Plaintiffs' statistical analysis therefore does not demonstrate that a racial disparity exists in the promotion of GS–13s to GS–14. Dr. Mann's study focused solely on the percentage of black GS–13s versus the percentage of black GS–14s as of July 31, 1999. However, he did not differentiate between GS–13s who were eligible to be considered for promotion from those who were ineligible during the period leading up to July 31, 1999. Such a comparison could yield results drastically different from those reached by Dr. Mann. Defendant has proffered that, as of January of 1999, the Secret Service employed 106 black GS–13 special agents. Of those 106 agents, only 36 had completed three years in grade and only 16 had actually bid for a promotion. (Saliunas Decl., Def.'s Opp'n Ex. 6 at ¶ 2.) Plaintiffs, who bear the burden of establishing that a disparity exists, thus have not supplied the relevant statistic: the percentage of black GS–13s who competed for and won a promotion versus the percentage of white GS–13s who competed for and won a promotion. Because plaintiffs' statistical analysis is insufficient to raise the presumption of class-wide discrimination through statistical evidence, I need not address the additional statistical evidence defendant has provided in rebuttal.

▮ Plaintiffs' failure to make a statistical showing of a disparity between the percentage of eligible whites and blacks promoted to the GS–14 level largely deprives plaintiffs' anecdotal evidence of its probative value. *See Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395, 405 (2d Cir.1981) (noting that, in the absence of relevant statistics, seven individual incidents of alleged subjective decision-making

were insufficient to give rise to an inference of pattern and practice discrimination). Plaintiffs' anecdotal evidence rests largely on the declaration of one agent—Special Agent Moore—and the defendant has contested the inferences that Special Agent Moore has drawn from his experience. Nevertheless, no matter whether Special Agent Moore has in fact been the victim of discrimination, a pattern and practice claim cannot rest on a single incident or even a few incidents of discrimination. *See id.* Accordingly, I find that plaintiffs have not demonstrated that they are likely to succeed on the merits of their claim that operation of the Peer Panel and Second–Level evaluations systematically discriminate against black GS–13 special agents.

### B. *Other Factors*

Because plaintiffs thus far have failed to show a likelihood of success on the merits, I shall not dwell long on the remaining factors I must consider. Without a showing that there is a disparity in the treatment of eligible black GS–13 level agents, plaintiffs cannot establish that they will be irreparably harmed, let alone extraordinarily irreparably harmed under the *Sampson* standard, if an injunction does not issue. I also have considered plaintiffs' claim that the harm they could face without an injunction is enhanced by the fact that this is a presidential election year, during which leadership positions on the Presidential and Vice–Presidential Campaign details are at stake. According to the Secret Service, however, virtually all of the highly-coveted positions that plaintiffs claim they will be denied if use of the MPP is not enjoined have already been filled or are temporary lateral assignments rather than promotions. (Spriggs Decl., Def.'s Opp'n Ex. 24 at ¶¶ 9, 11) (stating that selection for leadership assignments on the Presidential and Vice–Presidential Campaign Detail and for the 2002 Salt Lake City Winter Olympics have already been filled); (Third Spriggs Decl., Def.'s

Supp. Ex. 1 at ¶¶ 14–15) (stating that assignments for positions at Opsail 2000 (which has already occurred), the United Nations General Assembly Millennium Event, and the 2001 Presidential Inauguration are all temporary lateral assignments).[3] These facts further diminish the likelihood of imminent and irreparable harm to the plaintiffs.

The balance of harms and public interest also do not favor the issuance of injunctive relief on this claim. Enjoining the Secret Service from using its current promotion system when that system has not been shown to create racial disparities in promotions would cause an undue disruption in the operation of the Secret Service. Likewise, while the public interest is served by enjoining unlawful discrimination, it is against the public interest to disrupt the functioning of a government agency, particularly one with as important and sensitive a role as the Secret Service, without a strong showing that the discrimination is real rather than perceived. Accordingly, for the foregoing reasons, plaintiffs' application for a preliminary injunction that would stop the Secret Service from using the Peer Panel and Second–Level evaluations in upcoming promotion and transfer decisions will be denied.

### III. *Retaliation*

#### A. *Likelihood of Success on the Merits*

■ Plaintiffs allege that they have been retaliated against for their participation in this lawsuit and the preceding EEO process. In evaluating a retaliation claim, courts proceed through three steps, beginning with the plaintiffs' establishment of a *prima facie* case. *See Cones v. Shalala,* 199 F.3d 512, 520 (D.C.Cir.2000). To make out a *prima facie* case of retaliation, a plaintiff must show (1) that he or she has engaged in statutorily protected behavior,

(2) that his or her employer took an adverse personnel action against him or her, and (3) that a causal connection existed between the protected activity and the adverse action. *See Cones,* 199 F.3d at 521; *Paquin v. Federal Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir.1997); *Barnes v. Small,* 840 F.2d 972, 976 (D.C.Cir.1988); *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985). If the plaintiff establishes a *prima facie* case of retaliation, the employer "must articulate a legitimate nonretaliatory reason for its action ...." *Cones,* 199 F.3d at 520. If such a reason is given, the burden then shifts back to the plaintiff to "establish[ ] that the reason asserted by the employer is pretext for retaliation." *Id.*

■ Plaintiffs' allegations of retaliation are wide-ranging and have given rise to numerous factual disputes. Having reviewed the entire record in this case, which contains roughly seventy-five declarations from those who have alleged and been accused of retaliation plus the lengthy deposition testimony of the Secret Service's agency designee, I am not convinced that plaintiffs have demonstrated a substantial likelihood of success on the merits of their retaliation claims. Rather, I find that the evidence to date is in equipoise at best.

■ As a threshold matter, there is a serious question as to whether plaintiffs will be able to state a *prima facie* case with respect to several of their allegations because many of the challenged employment actions would not appear to rise to the level of "adverse action" that is required by this Circuit. In assessing whether an employee has been subjected to adverse employment action, the D.C. Circuit is "less concerned with the kind of employment action involved, than with its effect on the employee" and therefore "no

---

**3.** Defendant has since submitted the Declaration of Robert F. Byers, which notes that, since AD Spriggs submitted his declaration, one GS–14 position for the Salt Lake City Olympics came open due to a retirement, has been rebid, and is yet to be filled. (Byers Decl. at ¶¶ 3–5.)

particular type of personnel action [is] automatically excluded from serving as the basis of a cause of action under [Title VII]." *Brown v. Brody*, 199 F.3d 446, 455 (D.C.Cir.1999). However, in addressing whether lateral transfers are cognizable as adverse employment actions. *Brown* announced the following rule:

> [A] plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privilege of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.

*Id.* at 457. Materially adverse employment actions causing objectively tangible harm include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or decision causing a significant change in benefits." *Id.* at 456–47 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). By contrast, "[m]ere idiosyncracies of personal preference are not sufficient to state an injury." *Id.* at 457.

Here, much of the retaliation in which defendant is alleged to have engaged, whether resulting in lateral transfers or otherwise, would appear not to qualify as materially adverse employment actions causing objectively tangible harm. For instance, it is undisputed that Special Agent Summerour's transfer to the Protective Intelligence Division did not involve a reduction in grade or pay. Nor has Special Agent Summerour alleged that her job responsibilities have been substantially diminished in any way. She simply makes the conclusory assertion that she perceived the transfer to be "negative to her career." Special Agent Turner, by contrast, has alleged that his transfer involved a substantial diminution in responsibilities. However, it is also undisputed that Special Agent Turner has since been offered and has accepted a group leader position involving increased responsibilities. It is thus unclear at this point as to whether his lateral transfer has caused him any objectively measurable harm.

■ Special Agent Hendrix's claim that he was assigned "errand boy" tasks would appear to fall well under the adverse action bar. The evidence suggests that the tasks—obtaining holsters—appear not to be ordinarily relegated to low level employees. Whatever discomfort Special Agent Hendrix may have felt as a result of this single assignment, there was no objectively tangible harm.

■ The same can be said of the OIG investigation of Special Agent Moore. It is undisputed that no disciplinary action has been taken against Special Agent Moore as a result of the investigation. Consequently, there was no adverse action. *See Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir.1996) (holding that charges of wrongdoing in workplace alone cannot be adverse actions because "if the charges were ultimately dismissed, [the plaintiff] would not have suffered any adverse effect from them.").

I note that plaintiffs have asserted in their opposition to the defendant's motion to dismiss, but not in their preliminary injunction submissions, that the *Brown* framework applies only to individual claims of disparate treatment, and not to class-wide "pattern and practice" claims. Plaintiffs note that, in reaching its conclusion that a plaintiff had to demonstrate objectively tangible harm to make out a *prima facie* case of retaliation, the *Brown* panel was forced to distinguish *Palmer*. In *Palmer*, the D.C. Circuit relied on the broad language of 42 U.S.C. § 2000e–16(a) [4] to hold that an employee may bring

4. That provision of Title VII, which outlaws discrimination in the federal workplace, states that "all personnel actions affecting employees or applicants for employment ...

an actionable Title VII claim "with respect to any employment decision by an agency of the federal government .... regardless of whether the personnel action affects promotions or causes other tangible economic loss." *Palmer*, 815 F.2d at 97. However, "unlike *Palmer* ... Brown's claim [was] an individual disparate treatment claim rather than a pattern or practice claim" so that the "very different nature of the claim in *Palmer*" rendered it inapposite. *Brown*, 199 F.3d at 454. According to plaintiffs, because this is a pattern and practice case like *Palmer*, the reason that the *Brown* court gave for distinguishing *Palmer* does not apply here, thereby rendering the *Brown* framework inapplicable.

Plaintiffs may have raised an interesting and important issue, but it is one that I need not dispositively resolve at this juncture in the case. First, *Brown* would presumably apply to the plaintiffs' individual claims of retaliation, and plaintiffs' motion for a preliminary injunction deals primarily with alleged retaliation against the named plaintiffs rather than against the prospective class as a whole. Second, some of plaintiffs' allegations do involve alleged employment actions that could be construed as adverse even under the heightened *Brown* standard, such as allegations relating to non-promotion to the GS–14 level. Third, with respect to both the challenged employment actions that would likely qualify as adverse under *Brown* and those that probably would not, defendant has provided explanations of the legitimate non-discriminatory reasons for the challenged action. Plaintiff counters that the proffered reasons are all pretextual. However, the record at this point is best characterized as a tangle of contradictory factual assertions and inferences. Plaintiffs have not yet provided strong enough evidence discrediting the defendant's explanations for me to conclude that

plaintiffs are substantially likely to succeed on their retaliation claims. Although the evidence that plaintiffs have proffered so far may be sufficient to avoid summary judgment, in the context a motion for a preliminary injunction, it is plaintiffs' burden to establish a substantial likelihood of success on the merits. With the evidence at best in equipoise, plaintiffs have not carried that burden.

### B. *Irreparable Harm*

■ Even if plaintiffs had made a stronger showing on the merits of their retaliation claims, preliminary injunctive relief enjoining future retaliation would still be inappropriate under the circumstances. It is well-settled that preliminary injunctive relief is not usually available in employment cases because "[e]ven under the traditional standards of *Virginia Petroleum Jobbers, supra,* it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson,* 415 U.S. at 90, 94 S.Ct. 937. Thus, even if it is assumed that the plaintiffs will face future retaliation, the harm they would presumably suffer as a result is not irreparable because "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Virginia Petroleum Jobbers,* 259 F.2d at 925.

Recognizing this fact, plaintiffs claim that they will suffer a different type of harm. They contend that future acts of retaliation and intimidation will have a "chilling effect" on members of the prospective class, discouraging them from coming forward to join this lawsuit. As the D.C. Circuit has noted, "[r]etaliation

---

shall be made free from any discrimination based on race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e–16(a).

threatens the very core of Title VII's guarantees, for it may well dissuade employees from ventilating their grievances." *Wagner*, 836 F.2d at 574.

Plaintiffs find support for their irreparable harm argument chiefly in two district court cases, *Segar v. Civiletti*, 516 F.Supp. 314 (D.D.C.1981), and *Bonds*, discussed in Part I above. In *Segar v. Civiletti*, the district court preliminarily enjoined the transfer of a Drug Enforcement Administration ("DEA") agent who was the lead plaintiff in a class action much like this one alleging discrimination in the DEA's employment practices. The DEA agent was faced with an imminent transfer and demotion *after* a trial on the merits and the district court's issuance of findings that discrimination had existed in six areas, including supervisory evaluations. *See Segar v. Civiletti*, 516 F.Supp. at 318. Judge Robinson easily found that the decision to transfer and demote the agent less than a month after he issued his ruling was likely motivated by retaliatory animus. *See id.* Moving to the irreparable injury prong, Judge Robinson began by acknowledging that the plaintiff "would suffer no injury that could not subsequently be remedied." *Id.* at 320. Judge Robinson then reasoned as follows:

> Irreparable harm would however, attach to members of the Plaintiff class should this Court refrain from issuing the requested injunction. They must come forward with proof of specific injuries. Jackson, as the highest ranking Black DEA agent, is highly visible to members of the class. His unwarranted transfer and demotion would serve as an example to the class members know your place, don't challenge management, don't assert your right to equal employment opportunity. The message transmitted to the class members by this act of retaliation is clear; unless Plaintiff is protected now from the adverse action, members of the class will refrain from coming forward with their claims. The injury to them will be irreparable.

*Id.* Judge Robinson thus enjoined the planned transfer and demotion. He concluded his opinion by adding that "a primary reason for judicial restraint in the issuance of preliminary injunctive relief is the need for the Court to be fully informed before it injects itself into a dispute." *Id.* That reason was absent in *Segar* because the trial was already over.

*Bonds* also involved an application for a preliminary injunction to stop an imminent adverse action, this time a termination. The application was filed after full-blown discovery had concluded and the parties had cross-moved for summary judgment. After holding that the *Sampson* "extraordinary irreparable injury standard" applied, Judge Lamberth found that the plaintiff had met that standard. He reasoned that, if the termination was allowed to occur, it was unclear whether the plaintiff, who had worked for her employer for forty years and was nearing retirement age, "could ever find work approaching what she now does, if she could find work at all." *Bonds*, 950 F.Supp. at 1215. Judge Lamberth also noted that, although the plaintiff had presented no evidence in this regard, "a plaintiff who demonstrates that an adverse personnel action is likely to have a chilling effect on other employees who, after witnessing their fellow coworker's discharge or dismissal, would now refuse to file claims for fear of reprisals, would also meet *Sampson's* barrier." *Id.* at 1214–15.

I find that *Segar* and *Bonds* are both distinguishable from this case such that it would be inappropriate for me to issue an injunction enjoining future acts of retaliation. As an initial matter, the courts in both *Segar* and *Bonds* had the benefit of a fully-developed factual record which mitigated the danger that the court would reach premature conclusions about the merits of the case. *See Wagner*, 836 F.2d at 576 n. 75 (distinguishing *Segar* on this ground from a case in which plaintiff was still in the process of challenging his employer's actions); *Nichols v. Agency for*

*Int'l Dev.*, 18 F.Supp.2d 1, 5–6 (D.D.C. 1998) (distinguishing *Bonds* on the same ground). Although I have allowed some fairly extensive discovery to occur in connection with plaintiffs' retaliation allegations, the record is still rife with factual disputes which ultimately may have to be decided by a jury.

More importantly, both *Segar* and *Bonds* involved motions to enjoin a specific and imminent retaliatory action that was about to be taken against a specific person. The D.C. Circuit has held that, when a plaintiff seeks preliminary injunctive relief against acts of reprisal for engaging in protected EEO activity, the plaintiff must not only prove irreparable harm, but also the "imminence of further retaliation." *Wagner*, 836 F.2d at 576 & n. 75; *see also Competitive Enters. Inst. v. United States Dep't of Agriculture*, 954 F.Supp. 265, 276 (D.D.C.1996) ("The harm alleged cannot be speculative, and it must be 'both certain and great' ") (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985)). Here, plaintiffs have not identified any specific future retaliatory action that the Secret Service intends to take or is even likely to take against anyone. Instead, plaintiffs assume that, because retaliation supposedly occurred before, some undefined retaliatory action will be taken at an unspecified time at some point in the indefinite future. However, without stronger evidence that retaliation actually occurred and a more concrete showing of imminence, an injunction against future acts of retaliation is unwarranted at this time.

Notwithstanding my finding that plaintiffs are not entitled to a preliminary injunction against future acts of retaliation, I find that plaintiffs have shown that the Secret Service has engaged in activity which likely has had and will continue to have a chilling effect on the prospective class members' desire to assert their Title VII rights: Its genesis was the e-mail sent by Director Stafford to the entire Secret Service about this case right after plaintiffs filed their amended EEO complaint. While it was understandable for Director Stafford to claim that he was "troubled" by allegations of racism, he said more than that. He not only announced being "disappointed" by plaintiffs' allegations, but also declared that it was "offensive" for *anyone* to question the Secret Service's employment practices. Whether intended or not, such a proclamation of offense broadcast from the very head of the agency could easily be received as a warning that employees who exercise their right to challenge perceived racism in the agency do so at their own risk. And, despite other laudable language in the e-mail reaffirming the Secret Service's commitment to equal opportunity, a black agent could still reasonably infer that his or her career would not be enhanced, and might even be put in jeopardy, by joining litigation that the head of the agency had so strongly and unequivocally condemned. Indeed SAIC Carey allegedly conveyed that very message to Special Agent Ivery less than two weeks after Director Stafford's e-mail by warning, "If I were you, I wouldn't be the one upfront."

The Secret Service has since acknowledged that, in retrospect, Director Stafford did not make "the best choice of words." (Saliunas Dep. at 808.) Yet, the Director has neither retracted those words nor has he clarified them to his employees. His failure to take corrective action only reinforces the original shot across the bow.

The chilling climate begun by Director Stafford's proclamation may have been worsened within weeks by two different supervisors expressing disappointment over two different black special agents' links to discrimination allegations. This climate may even have been unwittingly exacerbated by the e-mails from senior black agents to the members of BASS. While the e-mails may simply reflect an ongoing internal debate in the black Secret Service community about the future of BASS, Inc., those e-mails may have sent a message, partly reinforcing Director Staf-

ford's, that people in high places at the Secret Service who have a major say over who gets promoted and who does not disapprove of BASS, Inc. and in turn plaintiffs' lawsuit.

I also find that the purported chill in this case is not speculative. It is true that a "single-statement allegation, buttressed by no factual support, cannot support a finding of irreparable injury based on a putative chilling effect." *Nichols*, 18 F.Supp.2d at 5. However, plaintiffs have provided buttressing factual support. The plaintiffs have all claimed to have felt intimidated by the barrage of e-mails. So has another black agent and member of BASS who is not a named plaintiff. (Ravenell Decl., Pls.' Reply Supp. Prelim. Inj. Ex. 1 at ¶¶ 6–14.) It is also undisputed that, in the wake of the e-mails, eight junior black agents resigned from BASS and six of them asked to be permanently removed from BASS's e-mail router. These eight individuals have also purportedly refused to speak with plaintiffs' counsel.

This last fact is significant. If the real reason for why the eight agents resigned from BASS was that they disagreed with the manner in which BASS, Inc. was being incorporated, one wonders why they would not simply say so to plaintiffs' counsel. A reasonable inference can be drawn that one or more of these agents have refused to speak at all because they fear reprisal.

Defendant contends that plaintiffs are resting on mere conjecture and have failed to provide direct evidence of a chilling effect. However, in the First Amendment context, where "chilling effects" are commonly litigated, the Supreme Court has rejected "unduly strict requirements of proof" in favor of "flexibility in the proof of injury." *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam*). Plaintiffs cannot be expected to come forward with testimony from individuals who are too afraid to bring their claims but not too afraid to put their fears on the record. To be entitled to injunctive relief, plaintiffs are required only to produce evidence showing that the action complained of is "*likely* to have a chilling effect on other employees" who would then refrain from coming forward with their claims. *Bonds*, 950 F.Supp. at 1215 (emphasis added). Here, the language of the e-mails themselves, the timing of the resignations in relation to the e-mails, and the refusal of those who resigned to even speak with plaintiffs' counsel all lead me to conclude that there likely has been a chill on at least some junior black agents. Accordingly, I find that plaintiffs will suffer irreparable harm if corrective action is not taken.[5]

### C. *Other Factors*

Both the balance of harms and the public interest weigh in favor of granting the plaintiffs limited preliminary injunctive relief which would require the Secret Service to send an agency-wide e-mail explaining that no retaliatory action will be taken by the Secret Service or its management against anyone who participates in this lawsuit, and that anyone who engages in such retaliatory conduct will be disciplined appropriately. Such an order, which would essentially require the Secret Service to reaffirm its pre-existing legal obligations, would impose no hardship upon the Secret Service. This form of targeted relief is far less drastic than the type of injunction contemplated by *Sampson* which would prevent a planned adverse personnel action from occurring. Unlike enjoining a demotion or a termination, ordering the issuance of a remedial e-mail neither threatens to paralyze the Secret Service from taking necessary personnel action nor intrudes upon the agency's prerogative over its internal operation. Moreover, such relief would serve the pub-

---

5. Because I find that plaintiffs have demonstrated that their Title VII rights have been chilled, I need not address plaintiffs' derivative contention that their First Amendment Free Speech and Association rights have also been burdened.

lic interest in combating discrimination and retaliation.

## IV. *Additional Matters*

### A. *Motion to Strike*

Plaintiffs have moved that I strike in whole or in part several of defendant's supplemental declarations which add to or contradict the agency designee's deposition testimony. Plaintiffs' objection is premised on the fact that Rule 30(b)(6) is aimed at preventing "bandying"—the practice "by which officers or managing agents of a corporation [or government agency] are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it." *Rainey v. American Forest and Paper Ass'n*, 26 F.Supp.2d 82, 95 (quoting Fed.R.Civ.P. 30(b)(6) advisory committee's note). Declarations cannot be considered if they raise "new or different allegations that could have been made at the time of the 30(b)(6) deposition." *Id.* at 94. Therefore, I have not considered the following statements which I consider to have raised either contradictory information or new information that could have been provided by the agency designee: Second Carey Decl., Def.'s Supp. Ex. 18; Third Spriggs Decl., Def's Supp. Ex. 1 at ¶¶ 7–13; Amended Ediger Decl., Def.'s Supp. Ex. 8 at ¶ 14; Bibb Decl., Def.'s Supp. Ex. 17. I have, however, considered challenged statements relating primarily to discrimination in promotions or other personnel decisions because discovery was limited to plaintiffs' retaliation allegations. Moreover, I have considered declarations relating to Special Agent Hendrix's non-assignment to a whip position because the transcript excerpts cited by plaintiffs include only questions and answers about the whip selection process in general rather than specific questions about Hendrix's non-assignment. Finally, I have considered sealed Exhibit 21 relating to Special Agent Ivery's "domestic incident" because that exhibit is documentary, as opposed to testimonial, evidence. Accordingly, plain-

tiffs' motion to strike will be granted in part and denied in part.

### B. *Administrative Leave*

In their supplemental brief, plaintiffs have alleged that they were retaliated against further when several of the named plaintiffs were denied paid administrative leave to attend the deposition of the Secret Service agency designee. Plaintiffs have asked that I permanently enjoin the defendant from refusing to grant the named plaintiffs' future requests for paid administrative leave to participate in further proceedings in this action, such as attending other depositions. That request will be denied.

Secret Service policy provides that an employee is entitled to administrative leave "(1) for jury duty or (2) to serve as a witness on behalf of any party in connection with any judicial proceeding to which the United States, the District of Columbia, or a state or local government is a part." (Def.'s Supp. Ex. 20.) Accordingly, plaintiffs are entitled to administrative leave when they are being deposed, but not when they wish to attend someone else's deposition or seek to engage in other case preparation. Contrary to plaintiffs' contention, it was not inconsistent or unfair for the Secret Service to deny the plaintiffs administrative leave while allowing the agency designee to use her leave. Ms. Saliunas, the designee, was the deponent while plaintiffs merely sought to attend her deposition. Director Stafford's denial of administrative leave to the plaintiffs and not to Ms. Saliunas was thus in accord with existing Secret Service policy.

As courts within this Circuit and elsewhere have recognized, "[t]here is no express provision in Title VII or its regulations granting an employee the right to administrative leave for judicial proceedings." *Shelborne v. Runyon*, No. Civ. A. 95–0641, 1997 WL 527352, at *16 (D.D.C. Aug. 21, 1997) (citing *Jones v. Babbitt*, 52 F.3d 279, 282 (10th Cir.1995), *overruled in part on other grounds by Randle v. City of*

*Aurora,* 69 F.3d 441 (10th Cir.1995)). Thus, "[w]hile courts allow administrative leave for the trial itself, they routinely deny it for trial preparation." *Id.* (citing authorities). Adherence to an established agency policy regarding administrative leave also goes a long way in rebutting any inference of discrimination or retaliation that might otherwise be drawn from the denial of paid leave. *See id.* at *15 (citing *Batson v. Powell,* 912 F.Supp. 565, 579 (D.D.C.1996), *aff'd,* 203 F.3d 51, 1999 WL 1337765 (D.C.Cir.1999)).

Plaintiffs rely on *Mitchell v. Baldrige,* 662 F.Supp. 907 (D.D.C.1987), for the proposition that plaintiffs have a general right to be placed on administrative leave whenever they seek to engage in preparation of their Title VII case. *Mitchell,* however, cannot be read so broadly. In that case, the district court granted a Title VII plaintiff's request to be placed on administrative leave for trial preparation. However, as has since been noted, "the court's holding in *Mitchell* is narrow in application." *Shelborne,* 1997 WL 527352, at *17. Mitchell's case had already been tried and appealed, so that Mitchell was not "an untested litigant." *Mitchell,* 662 F.Supp. at 909. Here, by contrast, plaintiffs are "still in the early stages of the litigation." *Shelborne,* 1997 WL 527352 at *17. Thus, they are not entitled to be exempted from the Secret Service's pre-established administrative leave policy. Plaintiffs' request for a permanent injunction ordering otherwise therefore will be denied.

### CONCLUSION

I will not enjoin the operation of the MPP because plaintiffs have not made a strong enough showing at this stage that the MPP systematically discriminates against black special agents. Plaintiffs have made a stronger showing on the merits of one aspect of their retaliation claims. Though I have found that most of the evidence on those claims is in equipoise, the other three preliminary injunction factors all weigh in favor of granting plaintiffs

limited injunctive relief targeted at alleviating the possible chilling effect that the Secret Service's reaction to this litigation has caused. However, because the Secret Service has asked to have until September 11, 2000 to consider issuing a voluntary corrective Service-wide e-mail that affirms employees' rights to pursue EEO claims, pledges no retaliation against anyone who participate in this litigation, and threatens appropriate discipline against anyone who does retaliate, I will defer ruling on the request for an order requiring such an e-mail. Finally, plaintiffs have not demonstrated that the Secret Service's denial of administrative leave was done in retaliation for engaging in protected EEO activity and should be enjoined. Accordingly, plaintiffs' application for a preliminary injunction will be denied in part and held in abeyance in part. An Order consistent with this Opinion is being issued today.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion issued this day, it is hereby

ORDERED that plaintiffs' Motion to Strike [65] be, and hereby is, GRANTED IN PART AND DENIED IN PART. It is further

ORDERED that the Second Declaration of Steve Carey, the Third Declaration of Danny Spriggs at ¶¶ 7–13, the Amended Declaration of Rebecca Ediger Declaration at ¶ 14, and the Declaration of Harold Bibb be, and hereby are, STRICKEN from the record. It is further

ORDERED that plaintiffs' Application for a Preliminary Injunction [8] be, and hereby is, DENIED IN PART and HELD IN ABEYANCE IN PART.